## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance, Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson,<br><br><br>Plaintiffs,<br>vs.<br><br>City of Minneapolis,<br><br><br>Defendant. | Case No.<br><br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

### Introduction

Plaintiffs Minnesota Voters Alliance, Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson move for a temporary restraining order against the Defendant City of Minneapolis, Minnesota. Minneapolis has accepted and will use a private federal election grant of $3 million from the Center for Tech and Civil Life (CTCL) to support and promote the November 3, 2020 general elections. CTCL has a nationwide pattern of providing private federal election grants to cities and counties with demographics showing progressive voting patterns. A government violates federal and state election law "if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups."[1]

Minnesota's state legislature has not approved any acceptance or use of CTCL private federal election grants as it would disrupt the lawfulness, uniformity, and fairness of federal

---

[1] *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015)

elections as federal moneys are provided for election processes and procedures.  Elections are core government responsibilities which must be publicly-funded.

Federal and state law preempt private federal election grants to Minnesota's political subdivisions: U.S. Constitution's Elections Clause and Supremacy Clause, National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501-20511, Help America Vote Act, 52 USC §§ 20901-21145, Minnesota Statutes § 609.42, and Minnesota 2020 Session Laws, Ch. 77. On every level, because of the preemptive effects of these laws, the City of Minneapolis has acted ultra vires, without legal authority, to accept and use CTCL's private federal election grant.

For example, the Help America Vote Act (HAVA) gives discretion to the "states," not municipalities, on how to implement federal elections:

> The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.[2]

Federal election law defines the word "state":

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.[3]

Minneapolis is not a state and has no legal authority to accept and use CTCL's private federal election grant.

The plaintiffs are entitled to a temporary restraining order enjoining the City of Minneapolis from accepting and using CTCL's private federal election grant.

---

[2] 52 U.S.C § 21085, Pub. L. 107–252, title III, § 305 (Oct. 29, 2002), 116 Stat. 1714.
[3] 52 USC § 21141.

**Statement of Facts**

I.    **Minneapolis sought and received a $3 million private elections grant from the progressive non-profit organization, CTCL.**

The Defendant City of Minneapolis is a Minnesota municipality—a political subdivision—located in Hennepin County, Minnesota. Minneapolis is a first class home-rule charter city. Minneapolis applied for and accepted a $3 million grant from the Center for Tech and Civic Life to support and promote federal elections, specifically for the forthcoming November 2020 general elections.[4]

CTCL is a Chicago based non-profit organization[5] that received $250 million from Mark Zuckerberg (creator of Facebook) and his wife Dr. Priscilla Chan[6] to provide funding for city and county election officials to perform election operations. CTCL's mission in part includes the training of public election officials in communication and technology and to inform and mobilize voters.[7]

Notably, CTCL can be characterized as a progressive organization.[8] While the organization seeks to "foster a more informed and engaged democracy, and help[ ]

---

[4] Kaardal Decl. Ex. C-5.

[5] *Id.* Ex. A-3.

[6] *Id.* Ex. C-5.

[7] *Id.* Ex. A-4–5.

[8] A critic of CTCL identified it as a "bunch of Democratic operatives using donations from left-of-center groups…" *Center for Tech and Civic Live" Democratic election operatives masquerading as concerned voters' group, critic says*, W.J. Kennedy, Legal Newsline (Aug. 24, 2020) Kaardal Ex. D. The article identified one of CTCL's founders, Tiana Epps-Johnson as the former administration director of the now-defunct New Organizing Institute, a Democratic grassroots election training group, and CTCL board member Tammy Patrick as a senior advisor to the elections program at Pierre Omidyar's Democracy Fund. In 2016, Omidyar, founder of e-Bay, apparently donated $100,000 to an anti-Trump PAC. *Id.* Likewise, key funders include the Skoll Foundation, the Democracy Fund, the John S. and James L. Knight

modernize elections" with its team of "civic technologists, trainers, researchers, election administration and data experts," it is using millions of dollars to target certain cities in certain states, which have progressive voting patterns, with private federal election grants for what is normally core government responsibilities—conducting federal elections—funded normally with federal and state moneys.

## II.    CTCL's 2020 private federal elections grant application process.

On its website, CTCL markets to election offices the federal election grants as "COVID-19 response grants":

> We provide funding to U.S. local election offices to help ensure they have the critical resources they need to safely serve every voter in 2020.

CTCL stated that it intends to award $250 million of private federal election grants to local election offices for the November 3, 2020 elections. Any U.S. election office that is responsible for administering election activities may apply for a private grant through a minimal grant application process.[9]   The grant application questions include:

- The number of active registered voters in the election office jurisdiction as of September 1, 2020;

- The number of full-time staff (or equivalent) on the election team as of September 1, 2020.

- The election office 2020 budget as of September 1, 2020;

- The election office's W-9;

- the local government body who approves the grant funding, if any; and

---

Foundation, the Rockefeller Brothers Foundation, and Rock the Vote. https://www.techandciviclife.org/key-funders-and-partners/ (last visited Sept. 21, 2020).
[9] Kaardal Decl. Ex. A-5.

- who should the grant agreement be addressed to.[10]

Meanwhile, CTCL states the purpose of the grants as to "directly help election offices administer safe and secure elections in November"[11] but the grants also include uses to support and promote elections. The private grants are to "to cover certain 2020 expenses incurred between June 15, 2020 and December 31, 2020. These include, but are not limited to, the costs associated with the administration of the following examples of election responsibilities":

**Ensure Safe, Efficient Election Day Administration**

- Maintain open in-person polling places on Election Day
- Procure Personal Protective Equipment (PPE) and personal disinfectant to protect election officials and voters from COVID-19
- Support and expand drive-thru voting, including purchase of additional signage, tents, traffic control, walkie-talkies, and safety measures

**Expand Voter Education & Outreach Efforts**

- Publish reminders for voters to verify and update their address, or other voter registration information, prior to the election
- Educate voters on safe voting policies and procedures

**Launch Poll Worker Recruitment, Training & Safety Efforts**

- Recruit and hire a sufficient number of poll workers and inspectors to ensure polling places are properly staffed, utilizing hazard pay where required
- Provide voting facilities with funds to compensate for increased site cleaning and sanitization costs
- Deliver updated training for current and new poll workers administering elections in the midst of pandemic

**Support Early In-Person Voting and Vote by Mail**

---

[10] Kaardal Decl. Ex. A-6.  *See also* https://form.jotform.com/202445110530135 (last visited Sept. 20, 2020).
[11] Kaardal Decl. Ex. A-3.

- Expand or maintain the number of in-person early voting sites
- Deploy additional staff and/or technology improvements to expedite and improve mail ballot processing.[12]

Minimum grants are $5,000, but the actual amount awarded is "based on a formula that considers the citizen voting age population and other demographic data of [the] jurisdiction."[13] Further, combined local government applications are encouraged for those who share election responsibilities.[14]

## III. CTCL's 2020 private federal election grants have gone to local governments with demographics showing progressive voting patterns.

So far, CTCL has provided private federal election grants to urban cities and counties in at least five of the "swing states"[15]: Minnesota (10), Pennsylvania (20), Wisconsin (10), Michigan (16), and Georgia (16). Depending on a person's source, the other three "swing states" include Arizona (11), Florida (29), and North Carolina (15). For all eight states, they represent 127 total electoral votes for presidency.  Although CTCL refers to itself as bipartisan, the founders and members of its board have roots in progressive politics.[16]

---

[12] Kaardal Decl. Ex. A4–5.

[13] *Id.* A-5.

[14] *Id.* A-6.

[15] "The 8 states where 2020 will be won or lost: A POLITICO deep dive," Sept. 8, 2020. The "selection of these swing states is based on a variety of factors — polling, demography, past and recent election history, voter registration, interviews with state and local party officials, strategists and pollsters." https://www.politico.com/news/2020/09/08/swing-states-2020-presidential-election-409000 (last visited Sept. 22, 2020).

[16] CTCL founders include Tiana Epps-Johnson, Donny Bridges, and Whitney May who previously worked at the now defunct New Organizing Institute (NOI), a center that was dedicated to training progressive groups and Democratic campaigns in digital campaiging strategies. Wellstone Action took over NOI's training programs. NOI's current executive director, Ethan Roeder, led the data departments for the Obama presidential campaigns of 2008 and 2012. Likewise, CTCL funders include other roups such as the Skoll Foundation,

The voting patterns of the local governments that CTCL have funded are overwhelmingly progressive. For example, Wayne County, Michigan, voted in 2016 for Hilary Clinton at 94.95% rate. As the chart below shows, CTCL's private federal election grants are targeting cities with demographics showing high rates of progressive voters.

| Jurisdiction/City | Grant Amount (in dollars) | Trump 2016 | Clinton 2016 | Clinton Percentage |
|---|---|---|---|---|
| Green Bay City, WI | 1,093,400 | 19,821 | 21,291 | 70.88% |
| Kenosha City, WI | 862,779 | 15,829 | 22,849 | 58.98% |
| Madison City, WI | 1,271,788 | 23,053 | 120,078 | 83.89% |
| Milwaukee City, WI | 2,154,500 | 45,167 | 188,653 | 80.68% |
| Racine City, WI | 942,100 | 8,934 | 19,029 | 68.05% |
| Philadelphia City, PA | 10,000,000 | 108,748 | 584,025 | 84.30% |
| Wayne County, MI-Detroit | 3,512,000 | 7,682 | 234,871 | 94.95% |
| Flint City, MI | 475,625 | 4,572 | 24,790 | 84.42% |
| East Lansing, MI | 8,500 | 4,147 | 13,073 | 75.9% |
| Lansing, MI | 440,000 | 11,219 | 32,716 | 74.46% |
| Minneapolis City, MN | 3,000,000 | 25,693 | 174.585 | 87.17% |
| Fulton County, GA - Atlanta | 6,000,000 | 110,372 | 281,875 | 69.2% |
| Richland County, SC | 730,000 | 52,469 | 108,000 | 67.2% |
| Delaware County, PA | 2,200,000 | 110,667 | 177,402 | 61.58% |
| Totals | | 548,373 | 2,003,237 | 78.50% |

The CTCL private federal election grant to Minneapolis of $3 million are moneys to facilitate voting of a specific demographic group: progressive voters. In the 2016 general election, 174,585 votes were cast for Hillary Clinton and 25,693 for Donald Trump. The rate of Clinton vote to Trump vote was 87.17%.

---

the Democracy Fund, the John S. and James L. Knight Foundation, and the Rockefeller Brothers Foundation.

Minneapolis had noted in June 2020 that "it is highly probably that [the city] will experience significant turnout this year" because of the "high-profile nature of presidential elections."[17] The same report stated that despite the anticipated increase of voters, there would be "no fiscal impact" to the City.[18] Yet, Minneapolis pursued and obtained the CTCL private federal elections grant.

CTCL documents show Minneapolis City Clerk and Director of Elections and Voter Services Grace Wachlarowicz is on CTCL's Advisory board:

> Grace Wachlarowicz
> Assistant City Clerk | Director of Elections and Voter Services, City of Minneapolis (MN)
> Grace Wachlarowicz ("walk-la-rō-its") is the Assistant City Clerk, Director of Elections and Voter Services for the City of Minneapolis. She received her B. A. in Business Administration and CERA through the Election Center. Grace began her career in elections in 1993 administering all facets of the municipal, school district, state, and federal elections. Since 2012, Grace has overseen all facets of election administration for the City of Minneapolis, including the Minneapolis School District, the third largest electoral jurisdiction in Minnesota, with 240,000 registered voters.

Kaardal Dec. Ex. E.  So, Wachlarowicz is on both sides of the private federal election grant: Minneapolis and CTCL.

## IV. The Minnesota legislature established the method of appropriations and grants for elections.

A core government responsibility of Minneapolis is to conduct elections within its jurisdiction. As a city, it cannot enact ordinances that will supersede or modify state or federal law regarding the conduct of federal elections. In this regard, Congress appropriated

---

[17] Kaardal Decl. Ex. D–1–3, Minneapolis Government and Policy Oversight Committee (June 5, 2020); https://lims.minneapolismn.gov/File/2020-00626.
[18] *Id.*

moneys to Minnesota of which the state Legislature appropriated over $7.4 million from the state's HAVA account to the Secretary of State as Minnesota's chief elections officer.[19] The Legislature also appropriated from the state's general fund to the state's HAVA account the amount of about $1.5 million.[20]

In addition, under the Federal Cares Act, the Legislature appropriated from the state's HAVA account over $6.9 million and the state appropriated another $1.4 million from the state's general fund to the state's HAVA account.[21] Both authorizations of the Legislature identified the uses of those moneys as found under Minnesota 2020 Session Laws, Chapter 77, §3, subdivision 4:

> 1) modernizing, securing, and updating the statewide voter registration system and for cybersecurity upgrades as authorized by federal law;
> (2) improving accessibility;
> (3) preparing training materials and training local election officials;
> (4) implementing security improvements for election systems;
> (5) funding other activities to improve the security of elections;
> (6) any activities authorized by section 4, subdivision 4;[22]

and as found under § 4, subdivision 4 to deal with COVID-19 issues:

> (1) ensuring the health and safety of election officials and in-person voters, including the purchase of sanitation and disinfectant supplies;
> (2) public outreach and preparations for implementing social distancing guidelines related to voting, including additional signs and staff;
> (3) facilitation, support, and preparation for increased absentee voting, including voter education materials, printing, and postage;
> (4) preparation of training materials and administration of additional training of local election officials;
> (5) preparation of new polling place locations;

---

[19] *See.* Minn. 2020 Session Laws, Ch. 77, §3, subd. 1 (May 12, 2020) and Minn. Stat. §5.30.
[20] *Id.* §3, subd. 2.
[21] *Id.* §4, subds. 1 and 2.
[22] *Id.* §3, subd. 4.

(6) purchasing an electronic roster system meeting the technology requirements of Minnesota Statutes, section 201.225, subdivision 2, along with equipment necessary to support the system; and
(7) issuing grants authorized by the local grant program established in subdivision 6, and administering that program.[23]

The Legislature further directed the Secretary of State to administer the grants for the appropriations to Minnesota's cities and counties for COVID-19 moneys under Chapter 77, §4, subdivision 4.[24]

---

[23] *Id.*. § 4, subd.4.
[24] Minn. Ch. 77, §

## Argument

### Plaintiffs are entitled to a temporary restraining order.

### The Plaintiffs satisfy the *Dataphase* factors for a temporary restraining order.

There are four factors to consider in determining whether a preliminary injunction, inclusive of a temporary restraining order, should issue: "(1) whether there is a substantial probability movant will succeed at trial; (2) whether the moving party will suffer irreparable injury absent the injunction; (3) the harm to other interested parties if the relief is granted; and (4) the effect on the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 112 (8th Cir. 1981) (en banc). In each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *See West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir.1986). The party requesting the injunctive relief bears the "complete burden" of proving all of the factors listed above. *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir. 1987).

I.    **The Plaintiffs are likely to succeed on the merits.**

    **A.**    **This case involves inherent public interests because it involves the use of private grants to affect, directly or indirectly, federal elections—which are a core government responsibility normally funded by government moneys.**

Congress and state legislatures fund election processes to conduct federal elections to support, improve, and implement election systems. Normally, government moneys fund federal elections because they are a core government responsibility. Principally, the State has the "power to regulate [its] own elections[,]" relying on the constitutional authority for states to regulate "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const., art. I, § 4. The Elections Clause provides the state with legal

authority over elections for congressional offices subject to Congressional enactments. Similarly, Article II of the United States Constitution governs presidential elections, distributing authority between the states and Congress. U.S. Const. art. II, § 1, cls. 2, 4. The Electors Clause provides that states appoint presidential electors and Congress determines the timing of the election and the day of electoral voting.

Federal election laws create regulatory mechanisms designed to deter corruption, prevent particular individuals or organizations from having an undue influence on federal elections, and assist in enforcement of laws prohibiting foreign contributions in federal elections, while also protecting the exercise of political speech so crucial to the functioning of this country's vibrant democracy. *Citizens for Resp. and Ethics in Washington v. Fed. Election Commn.,* 316 F. Supp. 3d 349, 368 (D.D.C. 2018), aff'd, 971 F.3d 340 (D.C. Cir. 2020) *citing Citizens United v. Fed. Election Commn.,* 558 U.S. 310, 366–67 (2010). Hence, the federal government and the states have "important regulatory interests" in fair, honest, and orderly elections. *See Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983). Thus, the conduct of elections is a core government responsibility of government entities because of the public interest in ensuring the fairness and integrity of Minnesota's elections. *Minnesota Voters All. v. Simon,* 885 N.W.2d 660, 667 (Minn. 2016) (citation omitted). Because federal elections are a core government responsibility, federal elections are normally funded with federal and state moneys.

HAVA ensures that in the disbursement of federal moneys for federal elections, each state receives a proportionate balance based upon specific criteria. The state then uses those moneys in a manner directed by law, including in the support of various county, city, town,

or village governmental entities who are required to conduct federal elections as a core government responsibility.

But, when private organizations provide grant moneys to specific cities and counties of based on favoring demographic groups with progressive voting patterns, there is an imbalance to the federal scheme under HAVA. Here, CTCL and Minneapolis are creating a public-private partnership in the conduct of federal elections, almost akin to privatization of the election process. And, because of the targeting of those cities in so-called key "swing states," the influence of private moneys is apparent on the election process. Thus, the issues brought before this Court *are* an inherent case of public interest.

When cases of inherent public interest are involved, "courts rarely focus on the three latter *Dataphase* factors; instead they look primarily to whether the party seeking the preliminary injunction is likely to succeed on the merits." *Jihad v. Fabian,* 680 F.Supp.2d 1021, 1031 (D. Minn. 2010) (quoting *Wickersham v. City of Columbia, Missouri,* 371 F.Supp.2d 1061, 1075 (W.D. Mo. 2005)). In cases involving inherent public interests, "the likelihood of success on the merits is often the determining factor in whether a preliminary injunction should issue." *Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir. 2008).

1. **The Minnesota Voters Alliance has a private cause of action and legal standing.**

The Minnesota Voters Alliance[25] has a private cause of action and has legal standing to seek a pre-election injunction against Minneapolis accepting and using CTCL's $3 million

---

[25] For convenience, "Minnesota Voters Alliance" includes all named Plaintiffs unless otherwise specifically identified.

private federal election grant for the November 3 election.  The Supremacy Clause and

HAVA confer a private cause of action and legal standing.

> **a.  The Supremacy Clause provides a citizen's private cause of
> action and legal standing to bring preemption lawsuits against
> local governments regarding federal elections.**

The Supremacy Clause of the United States Constitution, Article VI, clause 2, provides

a federal jurisdictional basis for a suit brought to enforce the provisions of federal election

law.  In *League of Women Voters v. Blackwell*, 340 F.Supp.2d 823 (N.D. Ohio 2004), the court

held that the Supremacy Clause of the U.S. Constitution (U.S. Const. Art. VI, cl. 2) provides

a basis for federal court jurisdiction of the League's suit that challenged an election official's

actions relating  to balloting procedures in federal elections as violative of HAVA, which has

preemptive effect:

> It is clearly established that the Supremacy Clause grants the federal courts
> jurisdiction over such claims; conflict with a federal law raises a federal question
> pursuant to 28 U.S.C. § 1331. In *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535
> U.S. 635 [ ] (2002), Verizon sued the Maryland Public Service Commission alleging
> that the commission's order that Verizon make payments under a negotiated
> interconnection agreement violated the Telecommunications Act of 1996. The
> district court dismissed the action for lack of jurisdiction. The Fourth Circuit
> affirmed. The Supreme Court reversed, finding that, where state action is preempted
> by federal law, § 1331 provides jurisdiction….
>
> While *Verizon* did not speak to the question of whether the Supremacy Clause created
> a cause of action as well as a grant of jurisdiction, "[t]he best explanation of *Ex Parte
> Young* and its progeny is that the Supremacy Clause creates an implied right of action
> for injunctive relief against state officers who are threatening to violate the federal
> Constitution or laws."
>
> Because plaintiffs' claim is that defendant's actions in his official duties violate a
> federal law which has preemptive effect, the Supremacy Clause provides the cause of
> action and federal jurisdiction.

340 F.Supp.2d at 827–28 (citations omitted).

Similarly, in this case, the Supremacy Clause provides the private cause of action and § 1331 federal issue jurisdiction. Like *League of Women Voter,* Minnesota Voters Alliance asserts that Minneapolis's actions violate a federal law which has preemptive effect. Specifically, the Minnesota Voters Alliance's claim is that federal law preempts Minneapolis officials from accepting CTCL's $3 million private federal election grant to conduct federal elections. As a federal preemption claim, the Supremacy Clause provides the cause of action and federal jurisdiction.

**b. HAVA, 52 U.S.C. § 21112, confers a private cause of action and legal standing to bring preemption lawsuits against local governments with regard to federal elections.**

**The absence of any appropriate remedy such as a pre-election injunction in an administrative action reflects the need for federal jurisdiction.**

HAVA, 52 U.S.C. § 21112, confers upon the Minnesota Voters Alliance a private cause of action and legal standing. It fits the statutory category of "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)." As to the Minnesota Voters Alliance's prospective remedies sought in this Court, HAVA, 52 U.S.C. § 21112, titled "Establishment of State-based administrative complaint procedures to remedy grievances," guarantees an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)" of HAVA. Under section (a) of 52 U.S.C. § 21112, Minnesota, having received federal HAVA payments, is "required to establish and maintain State-based administrative

complaint procedures which meet the requirements of paragraph (2)." Paragraph (2), among other things, requires that Minnesota provide that:

> (F) If, under the procedures, the State determines that there is a violation of any provision of subchapter III, the State shall provide the *appropriate remedy*.

(Emphasis added.)

However, here, Minnesota Statutes § 200.04 fails to provide the federally-required "appropriate remedy" to "any person who believes that there is… [a HAVA] violation which has occurred, is occurring, or is about to occur" because there is effectively no pre-election injunctive relief allowed under § 200.04. Section 200.04 does not provide the immediate injunctive relief necessary to stop the Minneapolis from accepting and using CTCL's private federal election grants before the November 3, 2020 election.

Further, § 200.04 authorizes no one, not even the Minnesota Attorney General, to pursue injunctive relief for HAVA violations against Minnesota's local governments. Hence, § 200.04 is legally insufficient to satisfy the federal "appropriate remedy" requirement under 52 U.S.C. § 21112 for "any person" filing a HAVA complaint in Minnesota to obtain pre-election injunctive relief Minnesota Voters Alliance has a private cause of action and legal standing under 52 U.S.C. § 21112 to pursue the relief sought.

### c. Voter standing regarding federal elections exists when the government favors demographic groups the same way it does when the government disfavors demographic groups.

Voter standing regarding federal elections exists when the government favors demographic groups the same way it does when the government disfavors demographic groups. The court in *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015)

summarized this way,   "[p]arity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups."   So, Minnesota Voters Alliance's standing depends on the injury that it suffers when CTCL's private federal election grants to local governments are targeted to progressive demographic groups—just as if Minnesota Voters Alliance itself were being suppressed.

### 2. Minneapolis's $3 million CTCL private federal election grant is in a subject area, federal elections, where public-private partnerships are constitutionally impermissible.

Minneapolis receives federal moneys through the Secretary of State to conduct federal elections.[26] But, Minneapolis also chose to seek and accept private moneys from CTCL. In receiving the CTCL $ 3 million grant, it created a public-private relationship, privatizing in part, the conduct of federal elections. As the previously presented facts reveal, the CTCL $3 million grant was provided to Minneapolis as an urban city—a demographic group which votes progressive.

In the last presidential election, Minneapolis voting overwhelmingly for the progressive candidate Hillary Clinton.   CTCL, a progressive organization, is targeting Minneapolis because its demographic group votes progressive.   While Minneapolis has recognized the high probability of a significant turnout in this presidential election due to the high profile nature of the election, as of June 2020, it did not anticipate any fiscal impact to the City.

---

[26] *See e.g.* Minn. Ch. 77.

Yet, the acceptance of CTCL's $3 million grant is no small monetary matter. Whether the accepted private funding might be for legitimate purposes, the private funding is an effort to encourage voting of a favored demographic group—an urban city within an identified swing state—that voted overwhelming democratic in the last presidential election.

The privatization of the conduct of elections, however "minor," disrupts the integrity of the election process of a city's core government responsibility. A public-private relationship in the subject area of federal elections invites private distortions of elections based on favored demographic groups.

Meanwhile, Congress and the state have provided for the funding to support, improve, or implement election systems.  It is the role of the government, not CTCL, to ensure the integrity, credibility, and reliability of federal elections. The courts must ensure that the government's elections policy is not supplanted by CTCL's private federal election grants. The courts must prevent CTCL's outside influences to skew the outcome of an election.

*Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group.  The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law.   The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular

will…." *Id.*   The court stated that the government favoring a demographic group was equivalent to the government disfavoring a demographic group:

> Historically, the law has focused on forms of "improper influence" that have interfered with the voting rights of disfavored demographic groups by dissuading or preventing them from voting through blatant means like fraud, violence, and intimidation. A government certainly violates the Elections Clause if it skews the outcome of an election in this manner. Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups. In both situations, the government has diminished the voting rights of one portion of the electorate and enhanced the voting rights of another portion of the electorate. In neither case is the election "free and equal."

*Id.*

As a case of first impression, no other case is analogous to the current Minneapolis public-private partnership in the context of federal elections. However, other cases show the need to announce the constitutional impermissibility of public-private relationships.

For example, in *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), the U.S. Supreme Court drew such a line finding a public-private partnership constitutionally impermissible. In *Kiryas*, the New York legislature sought to create a homogenous school district for Satmar Hasidic Jews and did so by statute. This "religious" motive was improper for the state and the statute forming the new district was stuck down. *Id.* at 691.

Similarly, in *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (U.S. 2001), the U.S. Supreme Court held another public-private partnership unconstitutionally impermissible. Here, the local prosecutor, concerned about crack babies, teamed up with the local hospital to develop a program seeking to prevent expecting mothers from using cocaine during the pregnancy. They developed a program where the hospital would test for the presence of

cocaine and provide a program to help with abstinence.  If the patient refused, the results were shared with the prosecutor's office that in turn would encourage participation at the threat of prosecution.  The U.S. Supreme Court found the entanglement of public and private interests sufficient to conclude the blood test by the hospital was a Fourth Amendment violation by the state. *Id.* at 86.

As previously mentioned, the conduct of elections are a core public responsibility which must be publicly-funded. Governmental entities are expected to remain neutral. Scholars have warned of the hazard presented by partisan government conduct: "[P]ermitting the government to depart from a neutral position would threaten both the reliability of the election result as an expression of the popular will and the appearance of integrity crucial to maintaining public confidence in the electoral process."[27] And in Minnesota, "[t]here is, to be sure, significant public interest in ensuring the fairness and integrity of Minnesota's elections. *Minnesota Voters All. v. Simon*, 885 N.W.2d at 667 *citing Wichelmann v. City of Glencoe,* 200 Minn. 62, 65, 273 N.W. 638, 639 (1937). *See also Bullock v. Carter*, 405 U.S. 134, 145 (1972) (recognizing states' interests maintaining integrity in election processes).

The idea of the federal and state government exclusively funding federal elections is to eliminate undue influence and the appearance of undue influence by private parties. With the

---

[27] Steven J. André, Government Election Advocacy: Implications of Recent Supreme Court Analysis, 64 Admin. L. Rev. 835, 851 (2012), *citing* Note, The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns, 93 Harv. L. Rev. 535, 554, 554 n.112 (1980) (observing that "[t]he [United States Supreme] Court has explicitly recognized that the validity of elections as bona fide expressions of the popular will depends as much upon citizens' faith that the electoral process is free from government tampering as on the actual fairness of that process").

entanglement of public and private interests, CTCL's private funding of federal elections introduces undue influence and the appearance of undue influence into federal elections— which should be declared is constitutionally impermissible.

### 3. Minneapolis acceptance of the CTCL $3 million grant is preempted by federal and state law.

Whether a local government action is preempted by federal law such as HAVA is to be determined by application of conflict-preemption principles. The federal court held in *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006), that in adjudicating HAVA preemption issues, the court will find preemption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Similarly, the Pennsylvania Supreme Court held in *Kuznik v. Westmoreland County Bd. of Com'rs*, 588 Pa. 95, 902 A.2d 476 (2006), in resolving an issue of preemption of a state statute by HAVA, state law may be displaced under conflict preemption principles if the state law in question presents a conflict with federal law in one of two situations: when it is impossible to comply with both the state and the federal law, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Consistently, the federal court instructed in *Colorado Common Cause v. Davidson*, 2004 WL 2360485 (Colo. Dist. Ct. 2004) that since Congress recognized that HAVA did not occupy the field of elections, particular preemption questions can only be answered by considering the purpose of the particular federal provision and measuring it against state provisions to determine whether a particular state provision does or does not conflict with the particular

federal provision.

Specifically, the following laws preempt Minneapolis's actions of approving and using CTCL's private federal election grants because it is impossible for the CTCL $3 million private federal election grant to comply with state and federal law and the private federal election grant stands as an obstacle to the accomplishment and execution of the full purposes and objectives of federal law.

### a. U.S. Constitution's Elections Clause and Supremacy Clause preempt CTCL's private federal election grants to local governments.

The U.S. Constitution, Article I's Elections Clause and Article VI's Supremacy Clause preempts CTCL's private federal elections grant to local governments.  The Elections Clause states:

> Time, place, and manner of holding. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators.

U.S. Constitution, Art. I, sec. 4, cl. 1. The Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections, *e.g., Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986) but does not authorize them to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints, *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 833-43 (1995)

The Supremacy Clause states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Constitution, Art. VI, sec. 2.

The Elections Clause and Supremacy Clause apply in this case. The Elections Clause, as applied here, ensures that the federal government and state legislatures determine the time, place and manner of federal elections—not CTCL and local governments. The Supremacy Clause, as applied here, ensures that local governments do not act contrary to federal and state law regarding federal elections.

The Elections Clause and Supremacy Clause preempt CTCL's private federal election grants to local governments. CTCL's private federal election grants are not legally authorized by federal law nor state law. The City of Minneapolis has acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

### b. Help America Vote Act (HAVA) preempts CTCL's private federal election grants to local governments.

The Help America Vote Act (HAVA), 52 USC § 209, preempts CTCL's private federal election grants for the following reasons. HAVA established the Election Assistance Commission (EAC) to assist the states regarding HAVA compliance and to distribute HAVA funds to the states.

EAC is also charged with creating voting system guidelines and operating the federal government's first voting system certification program. EAC is also responsible for maintaining the National Voter Registration form, conducting research, and administering a national clearinghouse on elections that includes shared practices, information for voters and other resources to improve elections.

HAVA requires that the states implement the following new programs and procedures:

- Provisional Voting
- Voting Information
- Updated and Upgraded Voting Equipment
- Statewide Voter Registration Databases
- Voter Identification Procedures
- Administrative Complaint Procedures

In the past, Minnesota's HAVA plan, required by HAVA, was approved by the EAC. HAVA's purpose was to coordinate federal and state administration of federal elections. HAVA does not legally authorize local governments to accept private federal election grants. HAVA's preemption prohibits local governments from accepting private federal election grants.

Under HAVA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way. The CTCL's private federal election grants circumvent the EAC and the states and thus conflict with HAVA. Under HAVA, the EAC and the states work toward election plans and budgets.

CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election administration plans and budgets—thus, conflicting with HAVA. The federal and state money distributed to county and city clerks that administer elections are distributed pursuant to a legally-authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for election purposes. But, local governments accepting CTCL's private federal election grants, violate HAVA by injecting money into federal elections which is not approved by the EAC or the states.

States are not allowed to deviate from plans submitted under HAVA. Local governments accepting CTCL's private federal election grants, violate HAVA. The CTCL's private federal election grants to local governments are not part of HAVA.

Minnesota, consistent with HAVA and under the EAC's guidance, has already approved a fiscal plan for its elections. The CTCL's private federal election grants to the Minnesota's cities circumvents and violates that fiscal plan. In Minnesota, it is too late for the state to modify its plan around CTCL's private federal election grants to ensure the legally-authorized, uniform and fair election HAVA requires. The Supremacy Clause, as applied to HAVA, ensures that Minnesota cities do not act contrary to HAVA regarding federal elections. HAVA preempts CTCL's private federal election grants to the cities. Under the Supremacy Clause and HAVA, CTCL's private federal election grants are not legally authorized by federal law or state law. The City of Minneapolis has acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grant.

### c. The National Voters Registration Act (NVRA) preempts CTCL's private federal election grants to local governments.

National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501–20511, preempts CTCL's private federal election grants for the following reasons. Congress enacted the National Voter Registration Act of 1993 (also known as the "Motor Voter Act"), to create "national procedures for voter registration for elections for Federal office." 52 U.S.C. § 20503. The Act gave responsibility to the Federal Election Commission (FEC) to provide States with guidance on the Act, to develop a national mail voter registration form, and to

compile reports on the effectiveness of the Act. A 2002 amendment in HAVA transferred the FEC's responsibilities under the Act to the EAC.

Section 5 of the NVRA requires states to provide individuals with the opportunity to register to vote at the same time that they apply for a driver's license or seek to renew a driver's license, and requires the State to forward the completed application to the appropriate state or local election official.  52 U.S.C. § 20504.

Section 6 of the NVRA provides that citizens can register to vote by mail using mail-in-forms developed by each state and the Election Assistance Commission. 52 U.S.C. § 20505.

Section 7 of the NVRA requires states to offer voter registration opportunities at all offices that provide public assistance and all offices that provide state-funded programs primarily engaged in providing services to persons with disabilities. Each applicant for any of these services, renewal of services, or address changes must be provided with a voter registration form of a declination form as well as assistance in completing the form and forwarding the completed application to the appropriate state or local election official. 52 U.S.C. § 20506.

Section 8 of the NVRA also creates requirements for how States maintain voter registration lists for federal elections. 52 U.S.C. § 20507.  NVRA's purpose was to coordinate federal and state administration of voter registration for federal elections and to create legally-authorized, nationwide, and uniform standards for voter registration.

NVRA does not legally authorize local governments to accept private federal election grants for voter registration. NVRA's preemption prohibits local governments from accepting private federal election grants for voter registration.

Under NVRA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way on voter registration for federal elections. The CTCL's private federal election grants circumvent the EAC and the states and thus conflicts with NVRA. Under NVRA, the EAC and the states work toward voter registration plans and budgets. CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election voter registration administration plans and budgets—thus, conflicting with NVRA.

The federal and state money distributed to county and city clerks that conduct voter registration are distributed pursuant to a legally-authorized method, that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for voter registration. But, local governments accepting CTCL's private federal election grants, violate NVRA by injecting money into federal election voter registration which is not approved by the EAC or the states. States are not allowed to deviate from the NVRA. Local governments accepting CTCL's private federal election grants, violate NVRA.

The CTCL's private federal election grants to local governments are not part of NVRA. Minnesota, consistent with NVRA and under the EAC's guidance, has already approved a fiscal plan for voter registration for federal elections. The CTCL's private federal election grants to the Minnesota's cities circumvent and violate that fiscal plan. In

Minnesota, it is too late for the state to modify its plan in response to CTCL's private federal election grants to ensure the legally-authorized, uniform and fair election NVRA requires.

The Supremacy Clause, as applied to NVRA, ensures that Minnesota cities do not act contrary to NVRA regarding federal elections.NVRA preempts CTCL's private federal election grants to the cities. Under the Supremacy Clause and NVRA, CTCL's private federal election grants are not legally authorized by federal law or state law.  The City of Minneapolis has acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

> **d. The CTCL private federal election grant to Minneapolis is preempted because the Minnesota legislature established by law the method of appropriations and grants for elections.**

The CTCL private federal election grant to Minneapolis is preempted because the Minnesota legislature established by law the method of appropriations and grants for elections.  As a city, Minneapolis cannot enact ordinances that will supersede or modify state or federal law regarding the conduct of federal elections. In this regard, Congress appropriated moneys to Minnesota of which the state Legislature appropriated over $7.4 million from the state's HAVA account to the Secretary of State as Minnesota's chief elections officer.[28] The Legislature also appropriated from the state's general fund to the state's HAVA account the amount of about $1.5 million.[29]  In addition, under the Federal Cares Act, the Legislature appropriated from the state's HAVA account over $6.9 million and the state appropriated another $1.4 million from the state's general fund to the state's

---

[28] *See.* Minn. 2020 Session Laws, Ch. 77, §3, subd. 1 (May 12, 2020) and Minn. Stat. §5.30.
[29] *Id.* §3, subd. 2.

28

HAVA account.[30] Both authorizations of the Legislature identified the uses of those moneys as found under Minnesota 2020 Session Laws, Chapter 77, §3, subdivision 4.  The Legislature further directed the Secretary of State to administer the grants for the appropriations to Minnesota's cities and counties for COVID-19 moneys under Chapter 77, §4, subdivision 4. The CTCL private federal election grant was never approved by the state legislature.  So, it is preempted under both federal and state law.

Moreover, under 52 U.S.C. § 21085, "the specific choices on the methods of complying with the requirements of this subchaper shall be left to the discretion of the State." "Subchapter," refers to the minimum requirements[31] regarding voting systems standards,[32] voting information requirements and computerized statewide voter registration list requirements and requirements for voters who register by mail.[33] "State" does not mean "city" or "municipality."[34] Therefore, as it pertains to federal elections, Minneapolis cannot act contrary to laws of either the federal or state governments. Each preempt actions of Minneapolis.

e. **Minnesota Statutes § 609.42 prohibiting election bribery preempts the City of Minneapolis from accepting and using CTCL's private federal election grant.**

Minnesota Statutes § 609.42 preempts CTCL's private federal election grants to cities. Minnesota election officials accepting and using CTCL's private federal election grants violate Minnesota Statutes § 609.42 prohibition on bribery.  Section § 609.42 prohibits public

---

[30] *Id.* §4, subds. 1 and 2.
[31] 52 U.S.C. § 21084.
[32] 52 U.S.C. § 21082.
[33] 52 U.S.C. § 21083.
[34] 52 U.S.C. § 21141: "In this chapter, the term 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

officials from receiving money to induce a voter to vote in an "election." Here, the "influence" is on a core government responsibility that has traditionally been publicly-funded. Minneapolis has accepted the progressive CTCL's private federal election grant to turn out the progressive vote in Minneapolis.

Minnesota Statutes § 609.42 states that such conduct is bribery:

> 609.42 BRIBERY.
>
> Subdivision 1.Acts constituting.
>
> Whoever does any of the following is guilty of bribery and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both:…
>
>  (2) being a public officer or employee, requests, receives or agrees to receive, directly or indirectly, any such benefit, reward or consideration upon the understanding that it will have such an influence...

It is election bribery under § 609.42 for Minneapolis to accept and use CTCL's private federal election grant without a state legislative enactment approving it. Section 609.42 preempts CTCL's private federal election grant to Minneapolis. CTCL's private federal election grant to the City of Minneapolis is not legally authorized under Minnesota Statutes § 609.42. Minneapolis has acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

## II.   The moving party will suffer irreparable injury absent the injunction.

The Minnesota Voters Alliance, absent the injunction, will suffer irreparable injury. There is no administrative remedy that can be granted under HAVA or another federal or state statutory election law that will provide for immediate injunctive relief. In short, the Minnesota Voters Alliance has no other option to challenge Minneapolis's acceptance of a $3

million private federal elections grant. Minneapolis's acceptance of CTCL's grant reveals a public-private relationship that privatizes federal elections to skew the outcome of an election in an urban city of a favored demographic group. It skews the neutrality of an election which is the core public responsibility of Minneapolis. *Red Clay Consol. Sch. Dist.*, 122 A.3d at 857–58

Threats of private unconstitutional interference with the November 3 elections pose the same type of "irreparable injury" and are analogous to "irreparable injury" for First Amendment deprivations. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 752 (8th Cir. 2008). "For this reason, the irreparable harm factor generally weighs in the movant's favor in First Amendment cases, although it is often intertwined with a court's evaluation of the likelihood of success on the merits." *Seaton v. Wiener*, 22 F.Supp.3d 945, 951 (D. Minn. 2014).

Once the November election occurs, the damage to what is to be fair and uniform elections is complete. Without injunctive relief, the CTCL moneys will cause a non-conformity of uniform elections in Minneapolis sought by Congress under HAVA and all other election laws, including those of the state of Minnesota. This illegal public-private partnership causes the plaintiffs irreparable injury.

**III.    The harm to other interested parties is little or none if the relief is granted.**

The Minnesota Voters Alliance absent the injunction, will suffer harm. Minneapolis has admitted that despite the anticipated increase in voting, namely absentee ballot voting,

there would be no fiscal impact.[35] Hence, the need of the $3 million private federal election grant is questionable at best. Minneapolis has access to HAVA moneys and additional Cares Act moneys, specifically for election related needs—as does every other city or county in Minnesota responsible for conducting the 2020 federal elections.

On the other hand, the introduction of a public-private relationship in the federal election context is a first-time foreign element not contemplated by either HAVA or the Minnesota Legislature since the laws exclusively control the conduct and moneys related to federal elections. There is no question of the historical success and consistency of Minneapolis in its election process considering the percentages of voters casting ballots. What also is notably are the voter outcomes—predominately progressive. Hence, the $3 million grant from CTCL raises sufficient questions as to the propriety of the public-private created relationship and the facilitation of a favored demographic group. In short, injunctive relief to stay expenditures of the grant will cause little or no harm to the conduct of Minneapolis elections.

Moreover, a state grant process is in place through the Secretary of State's office should Minneapolis need more moneys. By doing so, Minneapolis will stay true to its core public responsibilities in conducting elections consistent with federal and state laws. not cause Notably, is. For these reasons, the balance of harms favors granting the motion.

## IV.     The public interest is aided by the preliminary injunction.

The public interest, absent the injunction, will be impeded.  Minneapolis's acceptance of CTCL's grant reveals a public-private relationship that privatizes federal elections to skew

---

[35] Kaardal Decl. Ex. D-3.

the outcome of an election in an urban city of a favored demographic group. It skews the neutrality of an election which is the core public responsibility of Minneapolis. *Red Clay Consol. Sch. Dis*t., 122 A.3d at 857–58. Threats of private unconstitutional interference with the November 3 elections pose the same type of public interest analysis as in First Amendment deprivations. The public interest factor in First Amendment cases generally favors granting the injunction. *Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008) (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation"). As in First Amendment cases, the determination of where the public interest lies should depend on the likelihood of success on the merits of the Supremacy Clause challenge "because it is always in the public interest to protect constitutional rights." *Id.*; *see also Seaton*, 22 F.Supp.3d at 951.

As discussed above, the Minnesota Voters Alliance has no alternative administrative remedy to obtain immediate injunctive relief against Minneapolis. There is no other avenue to challenge the illegality of the public-private partnership in a federal election in which a grant is specific to a particular demographic group to facilitate an election influencing a core public responsibility of government. On the other hand, the harm that defendant will experience if the Minneapolis does not receive CTCL's private federal election grant is little or none. Minneapolis can obtain additional funds from the state legislature or Secretary of State if it needs it. For these reasons, the public interest favors granting the motion.

**Conclusion**

For the foregoing reasons and to preserve Minnesota's democratic elections, the Court should grant the temporary restraining order.

Dated: September 24, 2020.          /s/Erick G. Kaardal
                                    Erick G. Kaardal, 229647
                                    Special Counsel for Amistad Project of the
                                    Thomas More Society
                                    Mohrman, Kaardal & Erickson, P.A.
                                    150 South Fifth Street, Suite 3100
                                    Minneapolis Minnesota 55402
                                    Telephone: (612) 341-1074
                                    Facsimile: (612) 341-1076
                                    Email: kaardal@mklaw.com
                                    *Attorneys for Plaintiffs*