## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance, Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson, | Civil No. 0:20-cv-02049-MJD-TNL |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
| City of Minneapolis, | |
| Defendant. | |

## I.    INTRODUCTION

The Defendant, the City of Minneapolis ("Minneapolis," or the "City), has developed an effective, comprehensive plan to ensure all Minneapolis voters can vote safely, securely, and efficiently in the highly consequential 2020 general election, even in the midst of a global pandemic that has already infected over 100,000 Minnesotans.[1]  The circumstances of the general election, already underway, are unlike any in a lifetime, perhaps longer.  In the August 2020 primary, City voters turned out to vote at their highest rate in 50 years, and an unusually large number of them voted absentee, whether by mail or by early in-person voting.[2]  Turnout in the general election will likely be even higher. The airborne nature of COVID-19 has required the City to coordinate an unprecedented response to protect voters and election workers: increasing access to earlier, more

---

[1]  *See* Minnesota COVID-19 Response, *Minnesota COVID-19 Dials* (last visited Oct. 8, 2020), https://mn.gov/covid19/.

[2]  Declaration of Grace Wachlarowicz at Exhibit 1 [hereinafter "Wachlarowicz Ex. __"].

physically distant voting methods; buying personal protective equipment ("PPE") to keep poll workers, election staffers, and voters safe as they interact; space rentals, signage, and supplies that assist in maintaining social distancing; and a voter outreach plan to help voters feel confident that, whatever voting method they choose, they can cast their ballot without endangering themselves or others.

These protective measures are critical, but expensive.  The City received a modest amount of federal funding through Congress' coronavirus response, the CARES Act, but not nearly enough to cover the cost of responsibly administering a high-turnout election during a pandemic.  Like most—perhaps all—local election jurisdictions around the country, Minneapolis normally bears the cost of its own election-administration work. Therefore, Minneapolis sought, and was awarded, a $2.3 million grant from an established, nonpartisan civic-engagement organization to help cover the cost of running a safe election.

But Plaintiffs—four individuals and one self-described election-integrity organization—sued.  They now seek preliminary injunctive relief barring the City from using those grant funds, which would prevent implementation of the City's plan for safe voting.  Plaintiffs' argument, fundamentally, is that too many people whose politics they disagree with live in Minneapolis, so anything that helps more City residents vote must bely a political agenda, and Plaintiffs are injured when the City's vote totals more accurately reflect the opinions of City voters.  In a democracy, discerning the will of the people is not a constitutionally cognizable injury, and Plaintiffs' claims must be dismissed for lack of Article III standing.

Plaintiffs' claims also reflect a fundamental misapprehension of reality. Local election administration is not funded wholly by the federal government, nor wholly by the federal and state governments together. In fact, in the normal course, local funds pay for local election administration. Plaintiffs do not cite a single statutory or constitutional authority barring the City from accessing non-federal, non-state funding sources. It is entirely consistent with federal and state law to pay for election administration with local funds, including grants made to local governments. Plaintiffs' claims also therefore fail on their merits. The only court so far to consider any of the substantively identical cases Plaintiffs' counsel has filed around the country swiftly denied the requested temporary restraining order, explaining that those plaintiffs had failed to show either irreparable harm or a likelihood of success on the merits. Declaration of Kristen Marttila, Ex. I [hereinafter "Marttila Ex. __"], filed herewith. This Court likewise should deny Plaintiffs' motion for a temporary restraining order.

## II.   FACTUAL BACKGROUND

The City applied for, and soon will receive, a grant from a nonpartisan civic-engagement nonprofit organization to support the City's work safely and securely administering the 2020 elections in the midst of a global pandemic. The grant-making organization, the Center for Tech and Civic Life ("CTCL"), was founded in 2012 to get more Americans civically engaged, and it provides tools and trainings to election officials so they can better serve their communities. Marttila Ex. A. For example, in June 2020,

CTCL teamed directly with the U.S. Election Assistance Commission[3] ("EAC") to offer a free, three-part course on election cybersecurity to local election offices nationwide, particularly those with limited technology resources.  Marttila Ex. B.

In 2020, recognizing the unprecedented challenges—and steep financial costs—posed by administering an election during a global pandemic, CTCL launched new grant programs to fund election-administration initiatives by local election offices around the country.  *See, e.g.*, Marttila Exs. D (grants to five Wisconsin cities), E (rural grant program).  A large private donation recently allowed CTCL to expand its existing grant program, beginning in September 2020.  Marttila Ex. F.

The grants provide funding in four main areas: (1) ensuring safe and efficient administration on Election Day (e.g., additional staffing, sourcing PPE, and obtaining supplies to expand drive-through voting); (2) expanding voter education and outreach efforts, such as publishing reminders for voters to verify and update their voter registration information prior to the election and educating voters on safe voting policies and procedures; (3) launching poll worker recruitment, training, and safety requirements; and (4) supporting early in-person and mail-in voting efforts.  Marttila Ex. H.  All local election offices responsible for these types of election activities are eligible to apply to CTCL's COVID-19 Response Grant program, regardless of state, size of jurisdiction, or demographics of constituency.  *Id.*  Every eligible election department CTCL verifies as

---

[3] The EAC is a bipartisan commission established by the Help America Vote Act ("HAVA"), Pub. L. No. 107–252, 116 Stat. 1666 (2002) (codified at 42 U.S.C. § 15301 *et seq.*), to assist states with election-related work.

legitimate will be approved for a grant, and unless the office specifically requests a lesser amount, will receive a minimum award of $5,000. *Id.* CTCL has no role other than providing the grant money. Over 1,100 jurisdictions have applied so far, in almost every U.S. state, with most applicants serving jurisdictions with fewer than 25,000 registered voters. *Id.* For example, in Minnesota, CTCL has awarded grants not just to Minneapolis, but to at least 21 other jurisdictions including, Albertville, in Wright County;[4] Becker, in Sherburne County;[5] and Watertown, in Carver County.[6] Marttila Ex. C.

The City first became aware that it was eligible to apply for a CTCL grant on August 20, 2020. Declaration of Grace Wachlarowicz [hereinafter "Wachlarowicz Decl. ¶ __"] ¶ 2, filed herewith. City staff determined that the grant opportunity could help alleviate the budget challenges facing the City as it prepared to administer the 2020 general election, and the week of August 24, it began working in earnest to prepare a grant application. *Id.* ¶¶ 3-4.

---

[4] In 2016, 60.28% of Albertville voters backed Donald Trump; 29.73% voted for Hillary Clinton. *See* Minnesota Secretary of State, *Results for Selected Precincts in Wright County: Albertville* (last updated Nov. 15, 2016), https://electionresults.sos.state.mn.us/results/Index?ErsElectionId=100&CountyId=86&DistrictId=&Scenario=Precincts&selectprecincts=886219&show=Show+Selected+Precincts.

[5] In 2016, 66.57% of Becker voters cast ballots for Trump; 23.28% voted for Clinton. *See* Minnesota Secretary of State, *Results for Selected Precincts in Sherburne County: Becker City* (last updated Nov. 14, 2016), https://electionresults.sos.state.mn.us/results/Index?ErsElectionId=100&CountyId=71&DistrictId=&Scenario=Precincts&selectprecincts=885698&show=Show+Selected+Precincts.

[6] In 2016, 62.51% of Watertown voters supported Trump; 28.21% supported Clinton. *See* Minnesota Secretary of State, *Results for Selected Precincts in Carver County: Watertown* (last updated Nov. 10, 2016), https://electionresults.sos.state.mn.us/results/Index?ErsElectionId=100&CountyId=10&DistrictId=&Scenario=Precincts&selectprecincts=883655&show=Show+Selected+Precincts.

Funding nuts-and-bolts election administration in Minneapolis has always fallen primarily, if not exclusively, on the City, and is paid entirely—or nearly so—with money from the City's general fund. *Id*. ¶ 5. Additional funding is rarely, if ever, available from the state or federal government. *Id*. ¶¶ 5-6. In 2016, for example, the City spent approximately $2.3 million to administer the general election alone. *Id*. ¶ 5. That money came entirely from the City's general fund; no funding came from the state or federal government. *Id*. For 2020, the City will soon receive $284,229 in funds from Hennepin County's distribution of federal CARES Act funding for election work specific to COVID-19, *see* Wachlarowicz ¶ 6 and Ex. 2, but it has not received, and does not expect to receive, any other state or federal funds (including HAVA funds) to defray its costs of administering the general election. Wachlarowicz Decl. ¶ 6. The CARES Act funds are welcome, but do not cover the cost of administering a general election in a way that comports with the governor's state of emergency and public-health guidance, especially given the high voter turnout the City anticipates. *Id*. ¶ 7. Given the current economic situation stemming from the pandemic, and given the City's needs following the civil unrest this summer, it would be very difficult, and maybe impossible, to secure additional money from the general fund to adapt the City's election administration to provide the safe, secure, and efficient voting experience City voters expect and deserve. *Id*. ¶ 8.

On September 1, 2020, City staff learned from news reports that CTCL had received significant additional funding for its COVID-19 Response Grant program. Wachlarowicz Decl. ¶ 9. Neither the fact of the additional funding nor the identity of the donors had any effect on the City's decision to apply for the grant, which was already in process. *Id*. The

City, along with other Minnesota jurisdictions administering elections, was also notified by the Minnesota Secretary of State's office that CTCL grants were available to assist with local election-administration expenses during the pandemic, and that the Secretary of State's office intended to apply for the "equivalent" state-level grant. *Id.* ¶ 12 and Ex. 3.

The City applied for $2,297,342 in grant funds (not $3 million, as Plaintiffs repeatedly allege), and ultimately was awarded the full amount it requested. *Id.* ¶¶ 13-14 and Exs. 1, 4, 5. The City Council has voted, and Mayor has agreed, to accept the grant funds, and that acceptance will occur on or after October 10, after notice and publication requirements are satisfied. *Id.* ¶ 15, Ex. 6.

As the application describes, CTCL's grant will fund numerous initiatives to ensure safe, secure, and efficient voting, even under existing pandemic conditions:

| | |
|---|---|
| **Absentee Ballot Assembly and Processing Equipment**<br>• *Additional staff;*<br>• *High-speed letter openers;*<br>• *Facility expansion to accommodate social distancing;*<br>• *Vehicle rental for daily transport of materials;*<br>• *Mailing and printing supplies* | $2,082,312[7] |
| **Early Voting Sites and Ballot Drop-off Options**<br>• *Additional staff for primary*<br>• *Signage*<br>• *Plexiglass barriers*<br>• *Printing*<br>• *Outdoor supplies* | $48,900[8] |

---

[7] Of this total amount, $1,816,203 is for expenses related to the general election, and $266,109 reimburses expenses from the August primary. *See* Wachlarowicz Ex. 1 at 6.

[8] Of this total amount, $17,500 is for expenses relating to the general election, and $31,400 reimburses expenses from the August primary. *See* Wachlarowicz Ex. 1 at 7.

| | |
|---|---|
| **In-person Voting at Polling Places on Election Day**<br>• *Materials like tape to mark social distancing, electrical cords, and door stops*<br>• *Printing for COVID-specific signage* | $3,295 |
| **Secure drop boxes and related needs**<br>• *Ballot boxes, transfer containers*<br>• *Outdoor supplies*<br>• *Signage*<br>• *Printing*<br>• *Staff*<br>• *Vehicle*<br>• *Pallet jack* | $82,525 |
| **Voter Outreach and Education (VOE)** | $50,000 |
| **PPE**<br>• *Masks and face shields for staff and voters*<br>• *Sanitizer*<br>• *Disposable gloves* | $30,310 |
| **Total** | **$2,297,342[9]** |

*See* Wachlarowicz Ex.1 at 4-9.

Plaintiffs—four Minneapolis residents and eligible voters, and one organization that purports to have members concerned with maintaining the integrity of Minnesota elections, *see* Compl. ¶¶ 4-8, sued the City, alleging that the acceptance of these grant funds violates various statutes and constitutional provisions. They do not point to any specific injury, alleging only that they "are injured" by the grant, Compl. ¶ 20, and that it "tortiously interfere[s] with plaintiffs' legal rights in the City of Minneapolis under federal law to legally-authorized, uniform and fair federal elections," Compl. ¶ 21. They allege violations

---

[9] Of this total amount, $1,833,703 is for expenses relating to the general election, and $297,509 reimburses expenses from the August primary. *See* Wachlarowicz Ex. 1 at 6-9.

of the Elections Clause and Supremacy Clause of the U.S. Constitution; the National Voter Registration Act ("NVRA"), 52 U.S.C. §§ 20501-20511; the Help America Vote Act ("HAVA"), 52 USC §§ 20901-21145, Minnesota's criminal bribery statute, Minn. Stat. § 609.42, and Minnesota Session Laws, ch. 77 (May 12, 2020), which adopts state-based administrative-complaint procedures for reporting alleged HAVA violations.

Plaintiffs now ask the Court to issue a temporary restraining order (or, at other times in their brief, a preliminary injunction) barring the City from using CTCL's grant funds. That relief, if granted, would jeopardize the City's ability to continue safely administering the election that is already under way. Plaintiffs lack standing, and their claims fail on their merits. The Court should deny their motion and dismiss their Complaint.

## III.   ARGUMENT

### A.   <u>Plaintiffs lack standing.</u>

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To seek emergency injunctive relief on any of their claims, Plaintiffs bear the burden of establishing that they have Article III standing to maintain this suit in federal court. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "A party invoking federal jurisdiction must support each of the standing requirements with the same kind and degree of evidence at the successive stages of litigation as any other matter on which a plaintiff bears the burden of proof." *Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Accordingly, to obtain preliminary injunctive

relief where relevant facts are contested, Plaintiffs must produce at least some evidence showing they have standing. *See Pavek v. Simon*, No. 19-CV-3000 (SRN/DTS), 2020 WL 3183249, at *9 (D. Minn. June 15, 2020) (in deciding preliminary-injunction motion, "requir[ing] more from the Plaintiffs than mere allegations of standing, but less than would be required in the face of a motion for summary judgment").

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan*, 504 U.S. at 560) (brackets omitted). The injury-in-fact requirement ensures that plaintiffs have a personal stake in the outcome of a controversy. *Id.* "[A]n injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). Future injury suffices only "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013)). A claim of future injury that is speculative or merely "possible" is "not sufficient." *Clapper*, 568 U.S. at 409.

Minnesota Voters Alliance ("MVA"), as an organizational plaintiff, must demonstrate either that it has standing "in its own right" because the organization itself has suffered a legally sufficient harm, or "as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511, 515 (1975). To have standing in its own right, MVA must have suffered its own injury-in-fact that gives it "a personal stake in the outcome of the

controversy," which is caused by the City's conduct and is redressable by a favorable litigation outcome. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). MVA's claimed injury must be "more than simply a setback to the organization's abstract societal interests." *Id*. at 379. Because MVA identifies no injury it has suffered that is distinct from the injury it ascribes to its membership, it cannot sue in its own right; it must instead show that it has standing to sue on behalf of its members, like the individual Plaintiffs. This type of standing requires, among other things, that MVA's members would otherwise have standing to sue in their own right. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). In other words, if the individual Plaintiffs lack standing, MVA lacks standing to sue on their behalf.

Plaintiffs never clearly articulate the theory of standing they believe permits them to litigate this case in federal court. At times, they suggest that the sheer fact that they have alleged various legal violations confers standing upon them. At other times, they seem to argue that the City's acceptance of the grant will boost voter turnout in the City, thereby favoring "the progressive vote" in 2020, and that this somehow constitutes an injury sufficient to confer Article III standing on Plaintiffs. Compl. ¶ 38; *see also id.* ¶¶ 56, 65, 155; Br. at 16. At still other times, Plaintiffs may be intending to argue that the City's acceptance of the grant will "influence" unidentified election officials' "performance of the[ir] powers or duties." Compl. ¶¶ 152-59; (citing and alleging violations of Minnesota's criminal bribery statute, Minn. Stat. § 609.42); Br. at 29-30 [ECF No. 9]. Each of these three theories suffers from fatal legal or factual deficiencies—or both—that compel denial of Plaintiffs' requested relief and the dismissal of this action.

1.   <u>Allegations of bare statutory violations do not constitute injury in fact.</u>

Plaintiffs incorrectly suggest that merely alleging the violation of various laws satisfies the injury-in-fact requirement.  *E.g.*, Compl. ¶¶ 11, 20-21; Br. at 15-16.  That argument is explicitly foreclosed by longstanding binding precedent.  Federal courts "refus[e] to serve as a forum for generalized grievances" that do not reflect a personal stake in the resolution of the issues sought to be adjudicated.  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam).  When "[t]he only injury plaintiffs allege is that the law . . . has not been followed," that is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [federal courts] have refused to countenance."  *Id*. at 442; *see also id*. at 439-42 (collecting and examining cases).

Plaintiffs' argument that the laws under which they sue provide them a private right of action does nothing to help their case on standing.[10]  *See, e.g.*, Br. at 14 ("The Supremacy Clause and HAVA confer a private cause of action *and legal standing*."  (emphasis added)).  "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48, (2016) (as revised May 24, 2016) (quoting *Raines*, 521 U.S. at 818).  *Spokeo* made clear that plaintiffs do not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Id.* at 1549.  Even where a statute explicitly provides a private right of action, the plaintiff nevertheless must demonstrate an injury

---

[10] As discussed below, several provisions of law Plaintiffs cite provide them no private right of action.

resulting from the statutory violation that is both particularized—that is, an injury that "affect[s] the plaintiff in a personal and individual way," *id*. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1)—and also concrete—that is, an injury that "actually exist[s]" in a way that is "'real' and not 'abstract.'" *Id*. at 1548-49 ("Article III standing requires a concrete injury even in the context of a statutory violation.").  In *Golan v. FreeEats.com, Inc.*, the Eighth Circuit explained that under *Spokeo*, "the requirements that an 'injury in fact' be 'concrete' and 'particularized' are separate inquiries" that must both be satisfied for standing to exist, even where Congress has explicitly identified a cognizable injury and explicitly created a private right of action to redress it.  930 F.3d 950, 958 (8th Cir. 2019).

The sole case upon which Plaintiffs rely for their statutory-standing argument fails them.  *League of Women Voters v. Blackwell* involved a challenge, pursuant to HAVA, to two different directives from the Ohio Secretary of State limiting the availability of provisional ballot procedures.  340 F. Supp. 2d 823, 824 (N.D. Ohio 2004) (citing *Sandusky Cty. v. Blackwell*, 339 F. Supp. 2d 975 (N.D. Ohio 2004)).  The decision Plaintiffs cite did not directly address standing, but in an earlier decision in a related case, the court concluded that a different set of organizational plaintiffs had standing to enforce rights created by HAVA because they or their members would suffer an injury in fact if, because of the Secretary of State's directives, eligible voters were denied the ability to cast a ballot, as HAVA entitled them to do.  *Sandusky Cty.*, 339 F. Supp. 2d at 987, *aff'd in part and rev'd in part on other grounds*, 386 F.3d 815, 816 (6th Cir. 2004); *see also League of Women Voters*, 340 F. Supp. 2d at 824 (citing *Sandusky Cty.*).  By contrast, Plaintiffs here have not

alleged that the grant they challenge would in any way impair their ability to cast a lawful ballot, as discussed in more detail below.

Plaintiffs cannot rest on the sheer allegation of statutory violations.  They must instead point to some injury arising under one of their other theories, and which is both concrete and particularized to them.  They cannot, for the simple reason that none exists.

> 2.  <u>The fear that a majority of eligible voters in Minneapolis will be able to safely cast votes for candidates whom Plaintiffs may disfavor does not confer Article III standing.</u>

Plaintiffs' primary theory of standing seems to be that the grant was made by CTCL, and accepted by the City, for the purpose of facilitating safe and secure voting by eligible Minneapolis voters who are statistically more likely to be "progressive," thereby favoring the more numerous "progressive" Minneapolis voters over the less numerous Minneapolis voters who are not "progressive."  This argument suffers from numerous fatal legal and factual deficiencies.

> a)  *Plaintiffs are not injured by grant-funded City initiatives that facilitate safe, secure voting by all City voters.*

To the extent this theory of standing rests on Plaintiffs' preference for specific (though unspecified) electoral outcomes in the 2020 election, that preference boils down to an interest "'in their collective representation in [government],' and in influencing the [government's] overall 'composition and policymaking." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018).  Such an interest is an "'undifferentiated, generalized grievance about the conduct of government'" that generally does not present "an individual and personal injury of the kind required for Article III standing."  *Id.* (quoting *Lance*, 549 U.S. at 439).  "A

citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative.  And the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable 'general interest common to all members of the public.'" *Id*. (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam)).

To be clear, "a person's right to vote is 'individual and personal in nature,'" so "'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id*. at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) and *Baker v. Carr*, 369 U.S. 186, 206 (1962)).  But Plaintiffs allege no injury to their right to vote.  For example, nowhere do they allege that they will be unable to cast a ballot, or that they will be forced to choose between voting under unsafe pandemic conditions and not voting at all.

To the contrary, as Minneapolis voters, the City's grant-funded expenditures will make it *easier* for the individual Plaintiffs to vote safely for the candidates of their choosing, and to have those ballots processed promptly and according to law, no matter which method of casting a ballot they may choose.[11]  Plaintiffs do not identify the method they intend to use in casting their ballots in the 2020 general election, but whatever option they may choose, the City has secured grant funds specifically intended to facilitate a safe, secure, and efficient voting process for all voters:

---

[11]  Although Plaintiffs challenge the legality of the grant in its entirety, $297,509 of the grant funds awarded to the City will reimburse expenditures already incurred specifically for the August 2020 primary.  Wachlarowicz Ex. 1 at 6-9.  Nowhere do Plaintiffs challenge these funds, or explain what injury could possibly flow from their retrospective reimbursement.

- If Plaintiffs choose to vote by mail, $360,910 in grant funds will pay for materials and supplies, and another $313,611 will cover infrastructure-rental fees (i.e., high-speed letter openers; van rental to transport documents; rental cost, including utilities, of the Minneapolis Convention Center to permit social distancing) to ensure their ballots are sent, received, and processed safely, securely, and efficiently. Wachlarowicz Ex.1 at 6.

- If Plaintiffs choose to return their absentee ballots via a secure drop box instead of by mail, they will benefit from the $82,525 in grant funds for staffing and efficiently administering those sites, through the use of signage and other supplies (e.g., ballot boxes, transfer containers, tents, space heaters). *Id*. at 7.

- If Plaintiffs choose to utilize one of the City's early-voting sites, $17,500 in grant funds will cover material needs (e.g., signage, plexiglass barriers) to safely and efficiently serve voters. *Id*. at 6-7.

- If Plaintiffs prefer to vote in-person on Election Day, $3,295 in grant funds will pay for COVID-specific signs and other supplies necessary to facilitate social distancing by voters and poll workers. *Id*. at 8.

- If Plaintiffs have not yet decided what method of voting they will use, the City has $50,000 in grant funds available to conduct voter-education efforts through direct mail and social media, following the pandemic-related curtailment of more typical voter registration drives and voter education events. *Id*. at 8-9.

- And, because the City cross-trains personnel to be able to staff each of these voting options adequately, no matter how Plaintiffs choose to vote, $1,141,682 in grant funds will ensure that sufficient personnel are available to administer and assist with whatever voting method they choose, *id*. at 5-6, and $30,310 in grant funds will ensure all election workers, poll workers, and voters have sufficient PPE to protect themselves, *id*. at 9.

None of these grant-funded expenditures impair the ability of the individual plaintiffs, or that of MVA's greater membership, to safely cast a ballot in the 2020 general election. Quite the opposite:  Together, they ensure that the full range of safe and lawful voting options are available to Plaintiffs, as they are to all other Minneapolis voters.  Plaintiffs do not—and cannot—contend that the initiatives described above injure them personally in any way.

Because Plaintiffs' own ability to vote is not injured by the grant, they may instead try to argue that they are injured by the fact that the grant will help make safe, secure, and efficient voting available to their Minneapolis neighbors, who they believe are statistically likely to hold divergent political views from Plaintiffs' own, on the theory that when people they disagree with vote, candidates they disfavor win.  But when your fellow citizens are able to safely cast a ballot you may disagree with, and a majority of them vote for a candidate you do not like, that is not an injury.  It is a democracy.  After all, in electing the President—the only office Plaintiffs specifically reference in their papers—it is "desirable that the sense of the people should operate in the choice of the person to whom so important a trust [is] to be confided."  THE FEDERALIST NO. 68 (Alexander Hamilton).  Plaintiffs cannot credibly claim Article III injury derived from the possibility that, absent the City's grant-funded initiatives, fewer of their neighbors would brave the pandemic to cast ballots in the 2020 general election, and that Plaintiffs would prefer those voters stay home.

Plaintiffs do not cite a single federal-court decision that has ever found Article III standing on the basis of such a theory, and the City is aware of none.  The one case Plaintiffs cite for this theory of standing, *Young v. Red Clay Consolidated School District*, was

decided by the Delaware Chancery court—the non-jury trial court in Delaware's state-court system—and did not include any analysis of Article III standing, as that doctrine applies in federal court. *See generally* 122 A.3d 784 (Del. Ch. 2015). *Young* does not appear to have ever been cited by any federal court anywhere in the United States for any purpose. Its relevance here is dubious at best.

Even if the Court were to accept Plaintiffs' argument that under *Young*, an injury in fact may exist for Article III purposes where the government "encourage[s] and facilitate[es] voting by favored demographic groups," thereby "skew[ing] the outcome of an election," *see* Br. at 16-17 (quoting *Young*, 122 A.3d at 858), *Young* nevertheless is inapposite. In *Young*, the defendant, Red Clay School District, successfully sought voters' approval of a tax increase. 122 A.3d at 790. But in the run-up to the election, Red Clay "encouraged and facilitated voting by families with children, who [it] believed would support the tax increase." *Id*. Simultaneously, it "discouraged and raised impediments to voting by elderly and disabled residents, who [it] believed would oppose the tax increase because many of them live on fixed incomes." *Id*. Plaintiffs in *Young*, "residents of Red Clay who opposed the tax increase but did not vote because they were unable to access the polls," sued under the Fourteenth Amendment to the U.S. Constitution and the Delaware Constitution's Elections Clause.

The facts and legal issues presented by *Young* differ significantly from those here, making it inapplicable. First, in contrast to the *Young* plaintiffs, who alleged what a federal court would likely recognize as a concrete and particularized injury—that they were "unable to access the polls" as a result of the school districts' actions—Plaintiffs in this

case have not alleged—and cannot credibly allege—that their own ability to vote in the 2020 general election will be impaired by the grant or the City expenditures they fund.  As discussed above, the grant will in fact *improve* Plaintiffs' access to voting.  And second, unlike the school district's strategic decision in *Young* to use demographic targeting expressly intended to "diminish[] the voting rights of one portion of the electorate and enhance[] the voting rights of another portion of the electorate," 122 A.3d at 858, the City has sought grant funds to facilitate safe voting by *all* eligible voters residing within its boundaries, regardless of voters' demographics, political alignments, or preferred voting methods.  A line-by-line review of the City's grant application reveals that the grant-funded initiatives are indisputably neutral as to voter demographics and ultimate electoral outcomes.  It is utterly unsupportable to contend, as Plaintiffs implicitly do, that they suffer a constitutionally cognizable injury when their local government facilitates safe, secure voting for all voters within its jurisdiction simply because Plaintiffs think too many of those voters will vote the "wrong" way.

> b)   *Protecting Minneapolis voters does not "cause" any particular election outcome.*

Even if Plaintiffs could conceivably be said to be injured in a concrete and particularized way by the future possibility that a majority of their fellow Minneapolis residents will vote for candidates Plaintiffs themselves oppose, Plaintiffs have not come close to showing the required causal relationship between the challenged use of grant funds and any particular election result.  The election outcome is "highly indirect and results from the independent action of . . . third part[ies] not before the court"—most notably, other

potential voters in Minneapolis and elsewhere.  *Allen v. Wright*, 468 U.S. 737, 757 (1984) (quotation omitted).  The causal chain between the City's receipt of the challenged grant and the potential victory or defeat of Plaintiffs' unidentified favored candidates is highly attenuated, and includes the following links that Plaintiffs have failed even to allege, much less prove:

- That the grant-funded expenditures for things like additional staffing, supplies, and facility rentals necessitated by the pandemic will in some way alter the size or composition of the electorate in the City;

- That any marginal change in the City's voting population could be fairly attributed to the grant-funded expenditures and not other intervening events, such as increased civic engagement or motivation to vote resulting from historically significant current events like a global pandemic;

- That any marginal change in the City's voting population will match the ideological composition of the City's electorate in past elections;

- That no such marginal changes will occur in other jurisdictions with non-"progressive" voter preferences, all of which are eligible to apply (or may have applied already) for CTCL grants, and

- That the marginal effect of the additional votes cast in one or more unspecified election contest will be large enough to change the outcome of the election in those races—for example, that a hypothetical increase in "progressive" voters within the City of Minneapolis would be large enough, or the vote close enough in enough other places, that the marginal change in Minneapolis' vote totals would determine not only which presidential candidate would win Minnesota's 10 electoral votes but also a majority of votes in the Electoral College.

Each of these conditions must exist to solidify the causal chain between the challenged grant and the allegedly injurious election results. But Plaintiffs can offer nothing beyond unfounded, "highly speculative" assumptions about how any of these independent third parties will act, or to what end. *See Clapper*, 568 U.S. at 410. Given the attenuated and speculative nature of each of these causal links, it would be virtually impossible to conclude that the threatened injury posed by an unspecified but unwelcome election result is "certainly impending" or that there exists a "substantial risk that the harm will occur." *Clapper*, 568 U.S. at 410, 414 n.5.

The one link in Plaintiffs' causal chain they *have* specifically alleged—that CTCL's, and the City's, intended uses of the grant funds are skewed in favor of "progressive" voters—is plainly not true. The grant will benefit all Minneapolis voters, regardless of political persuasion. All of the City's grant funds will be spent directly on improving the safety, security, and efficiency of casting a ballot and administering the election under unprecedented pandemic conditions. Those efforts do not favor or disfavor any group of voters. Wachlarowicz Decl. ¶ 16. The grants themselves are available to every local election office in the country that chooses to apply. Marttila Ex. H. The grant application does not ask for, and grant approval is not contingent upon, the demographic, political, or ideological makeup of the jurisdiction's constituents. CTCL's website publishes a list of frequently asked questions, including the following:

> **What information does my office need to provide in the grant application?**
>
> You will need to provide the following information in your grant application:

- Number of active registered voters in the election office jurisdiction as of September 1, 2020
- Number of full-time staff (or equivalent) on the election team as of September 1, 2020
- Election office 2020 budget as of September 1, 2020
- Election office W-9
- Local government body who needs to approve the grant funding (if any)
- What government official or government agency the grant agreement should be addressed to

Marttila Ex. G. Nothing in those categories suggests an ideological undercurrent to funding decisions. CTCL's website informs prospective applicants that every applicant CTCL verifies as a bona fide local election office will be approved for a grant, with a minimum grant award of $5,000. Marttila Ex. H. Within Minnesota, CTCL has already awarded grants to more than 20 Minnesota jurisdictions that vary significantly by population size, geography, and historical political alignment. Marttila Ex. C. According to data published by CTCL, as of September 25, 2020, more than 1,100 jurisdictions, in nearly every U.S. state, had applied and been approved for a grant, with the vast majority from jurisdictions with fewer than 25,000 registered voters—not remotely reflecting the marked preference for large, urban, demographically diverse, and historically "progressive" jurisdictions that Plaintiffs argue CTCL has "targeted" for grant funds. Marttila Ex. H. For example, according to CTCL, 85% of the local election jurisdictions in South Carolina have applied for the same grant program Plaintiffs challenge here; 60% of Iowa's election jurisdictions have done so. *Id.* Plaintiffs evidently do not consider either South Carolina or Iowa a "swing" state. *See* Br. at 6 (listing eight other states as swing states). Yet CTCL

has made grants to the overwhelming majority of election offices in those states, revealing as manifestly false Plaintiffs' assertion that CTCL's grants are somehow biased.[12]

In short, Plaintiffs' theory of causation is abstruse, hypothetical, and—in key respects—factually incorrect.  Given the impossibility of demonstrating anything more than a remote and "highly speculative" possibility of causation, *see Clapper*, 568 U.S. at 410, Plaintiffs' case fails for lack of Article III standing.

---

[12]  Given these uncontroverted facts, it should not be necessary to consider the makeup of CTCL's staff and advisory board.  But if the Court were inclined to do so, a cursory review would further reveal that Plaintiffs are simply incorrect when they characterize CTCL as some sort of covertly "progressive" organization.  In fact, CTCL's Advisory Board includes multiple individuals who do elections-related work in jurisdictions that in the past have voted overwhelmingly in favor of the non-"progressive" candidates who are presumably more aligned with Plaintiffs' political preferences.  *See* https://www.techandciviclife.org/advisory-committee/ (listing CTCL Advisory Committee members).  For instance, the Advisory Board includes elections officials with the Alaska Division of Elections, who serves a state which in 2016 voted for Donald Trump over Hillary Clinton by a margin of 51.28% to 36.55% (https://www.elections.alaska.gov/results/16GENR/data/results.htm);  Shasta County, California, where Trump won 63.90% of the vote in 2016, compared with Clinton's 27.52% (https://results.enr.clarityelections.com/CA/Shasta/64166/184224/Web01/en/summary.html), and Weber County, Utah, where Trump won 46.78%, Clinton got 26.89%, and Evan McMullin—widely considered a so-called "Never Trump" Republican candidate—won 19.13% (http://www.weberelections.com/documents/results/2016%20General%20Official%20Summary.pdf);      (https://www.npr.org/2016/08/08/489174101/meet-evan-mcmullin-the-nevertrump-movements-last-hope).  In short, Plaintiffs' allegation that CTCL could be fairly "characterized as a progressive organization"—a necessary link in their theory of causation for Article III standing—is baseless, self-serving, and contrary to the only reliable evidence in the record.  *See* Br. at 3 and n.8.

3.  Plaintiffs cannot demonstrate standing based on the allegedly corrupting influence of the grant on public officials.

To the extent Plaintiffs might intend to argue that the City's administration of the 2020 election will somehow be skewed in favor of unidentified candidates because the receipt of the grant creates some improper incentive that will corrupt City elections officials, *see* Br. at 30, that argument fails for multiple reasons.  First, any such future injury is entirely speculative, to the point of being unfounded; Plaintiffs can demonstrate neither that it is "certainly impending," nor that there is a "substantial risk that the harm will occur," as *Clapper* requires.  568 U.S. at 409-10, 414 n.5.  Moreover, Plaintiffs have elucidated no "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.  They have not explained, or even alleged, how seeking, receiving, and spending a grant to improve elections administration in a global pandemic will "influence [City election officials'] performance of [their] powers or duties."  Minn. Stat. § 609.42, subd. 1(1) (state statute criminalizing bribery); Br. at 29-30 (alleging that accepting the challenged grant constitutes criminal bribery).

Because Plaintiffs cannot establish standing under any of their theories, the Court should dismiss this action for lack of jurisdiction.

**B.    TRO/Preliminary Injunction Standard of Review**

When considering a motion for preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure, courts in the Eighth Circuit apply the four factors identified in *Dataphase Systems, Inc. v. C L Systems, Inc.*: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that

granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  640 F.2d 109, 113 (8th Cir. 1981). No preliminary injunctive relief should issue "unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quotation omitted).

Here, Plaintiffs cannot prove any one of the four *Dataphase* factors, and the Court therefore should deny their motion.

1.     Plaintiffs' claims fail on their merits.

The City's decision to apply for, and then accept, the grant was the result of "presumptively reasoned democratic processes": two successive votes by the City Council and approvals by the Mayor.  Wachlarowicz Exs. 4, 6.  Accordingly, Plaintiffs must show that they are "likely" to prevail on the merits.  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  But most of the legal violations Plaintiffs allege do not even give rise to a private cause of action, and all fail on their merits for freestanding reasons.  Notably, at least one court, in a substantially identical case recently filed by Plaintiffs' counsel in the Western District of Michigan, denied a TRO motion on that basis. *See* Order Denying Motion For Temporary Restraining Order And Establishing Briefing Schedule, *Election Integrity Fund v. City of Lansing*, No. 1:20-cv-950 (W.D. Mich.), Oct. 2, 2020, Marttila Ex. I.  This Court should do the same.

a)     *Most claims Plaintiffs raise provide no private right of action.*

Most of the constitutional and statutory provisions under which Plaintiffs sue confer no private right of action, and for that simple reason those claims could never survive as a

matter of law. *See Brooks v. Roy*, 881 F. Supp. 2d 1034, 1056-57 (D. Minn. 2012) (concluding that, because sued-under statute afforded plaintiff no private right of action, he was not likely to succeed on the merits of his claim).

(1)      Supremacy Clause

To the extent Plaintiffs' claims are premised on some alleged violation of the Supremacy Clause, they cannot prevail on the merits, because the Supreme Court has explicitly held that the Supremacy Clause does not create a private right of action.  It is simply a "rule of decision" to be applied in resolving legal disputes arising under some other authority; it "is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)).  To the extent that the Northern District of Ohio found the opposite in *League of Women Voters* in 2004, *see* 340 F. Supp. 2d at 827-28, that holding has not been good law since *Armstrong*'s clear holding to the contrary in 2015.  Consequently, Plaintiffs may not bootstrap their imagined conflict between federal and state law into a freestanding cause of action under the Supremacy Clause.

(2)      HAVA

The same problem dooms Plaintiffs' claims to the extent they are premised on an alleged violation of HAVA.  Plaintiffs fail to mention that the Supreme Court has reversed a TRO granted to a private plaintiff who alleged that the governmental defendant's failure to follow a particular HAVA provision would "dilute" the votes cast in the 2008 presidential election—in other words, a similar type of harm as Plaintiffs allege here.

*Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per curiam); *Ohio Republican Party v. Brunner*, 544 F.3d 711, 713 (6th Cir. 2008) (describing basis of claim). In so doing, the Court explained that the lower court erred in granting the TRO because the private plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized [a federal court] to enforce [the relevant substantive HAVA provision] in an action brought by a private litigant." *Brunner*, 555 U.S. at 6. The same reasoning bars Plaintiffs here from obtaining emergency injunctive relief on their HAVA claims.

It is plain enough why the Supreme Court reached the conclusion it did in *Brunner*. Courts do not lightly infer private rights of action into federal legislation that makes no express provision for them. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). That is particularly true where, as here, the statute expressly incorporates a different remedial scheme, because "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id*. at 290. "Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) (citing 52 U.S.C. §§ 21111, 21112). It conspicuously did not include among HAVA's potential remedial schemes any express right of action for private plaintiffs to seek relief in federal court for alleged HAVA violations, and such a private cause of action is not properly inferred from the statutory text. *Id*. at 1202-03; *Am. Civil Rights Union v. Philadelphia City Comm'rs*, 872 F.3d 175, 184-85 (3d Cir. 2007); 52 U.S.C. §§ 21111, 21112.

Plaintiffs seem to argue that because § 21112(F) requires states receiving HAVA funds to establish administrative-complaint procedures and "provide the appropriate remedy" in the event that the State finds a violation, Plaintiffs must have a private right of action if—as they contend—the state-based administrative complaint system is inadequate. They cite no case that has ever so held, and the argument is plainly wrong.

As an initial matter, any shortcoming of a state-based system would do nothing to alter the ability of the Attorney General to "bring a civil action against any State or jurisdiction . . . . for such declaratory and injunctive relief . . . as may be necessary." 52 U.S.C. § 21111.

Moreover, even if a state's administrative-complaint procedures are inadequate, the result is not that private plaintiffs can step in to sue instead.  Section 21142 provides that HAVA funds—the very funds whose receipt triggers the requirement that the state establish an administrative-complaint procedure—may be audited, and if the audit reveals that "a recipient of funds under this chapter is not in compliance with each of the requirements of the program under which the funds are received," the state must repay the affected portion of the funds to the federal government.  52 U.S.C. §§ 21142(b)(1), (c). The Eighth Circuit has repeatedly explained that "when a statute links funding to substantial compliance with its conditions . . . this counsels against the creation of individually enforceable rights." *Does v. Gillespie*, 867 F.3d 1034, 1042 (8th Cir. 2016), *reh'g and reh'g en banc denied* (2017); *Midwest Foster Care and Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200-01 (8th Cir. 2013).  The remedy Congress created to address any inadequacies in § 21112's state-based administrative complaint process was for

Congress to recoup funds paid to noncompliant states, not for private plaintiffs to litigate their own concerns in federal court.

Finally, the fact that Minnesota's procedures do not contemplate immediate enforcement by the Minnesota Attorney General or anyone else in the event of a suspected HAVA violation is not some gaping hole Plaintiffs must be permitted to rush in to fill.  *See* Br. 16 (arguing that Minn. Stat. § 200.04 "does not provide . . . immediate injunctive relief" and thus provides "effectively no pre-election injunctive relief").  Congress never intended the state-based administrative-complaint process to function in the way Plaintiffs urge. Congress required that, as a condition of receiving funds, states must maintain "administrative complaint procedures" that allow the state up to 90 days to make a final determination with respect to a complaint and, if ultimately "the State determines that there is a violation," it must at that point "provide the appropriate remedy."  52 U.S.C. § 21112(a)(1), (2)(H), (2)(G).  The procedures Minnesota has enacted do all that: the Secretary of State receives HAVA complaints, *see* Marttila Ex. J, and issues a final determination no later than 90 days after the complaint is filed.  *See generally* Minn. Stat. § 200.04, subd. 1-2.  For any complaints relating to the Secretary of State, the Office of Administrative Hearings performs those functions.  *Id*. subd. 3.  If appropriate, the responsible official must issue a remedial plan with the final determination.  *Id*. subd. 2(f), 3(f).  Congress never contemplated or intended that states—much less private actors— would function as the type of HAVA rapid-response team Plaintiffs insist is required.  The administrative-complaint process Minnesota adopted in Minn. Stat. § 200.04 is entirely consistent with Congress's express requirements.

(3)    NVRA

NVRA provides a private right of action only to individuals who are "aggrieved by a violation" of the statute.  52 U.S.C. § 20510(b)(1).  "Persons aggrieved by a violation of the NVRA are persons who allege that their rights to vote in an election for federal office have been impaired by a violation of the NVRA." *Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1031 (D. Neb. 2000); *see also Krislov v. Rednour*, 946 F. Supp. 563, 566 (N.D. Ill. 1996) ("Standing under the NVRA is limited to the United States Attorney General and the 'aggrieved persons' whose voting rights have been denied or impaired.").  For the same reasons Plaintiffs have suffered no injury in fact, as described in more detail above, Plaintiffs are not "aggrieved" by any alleged violation of the statute.  They may wind up unhappy with the ultimate electoral outcome if their neighbors can vote without incurring significant risk to their health, but that is not the sort of aggrievement this Court should countenance.  Because they are not "persons aggrieved" in any legally cognizable way by an alleged violation of NVRA, Plaintiffs have no private cause of action under that statute.

(4)    Minnesota's Criminal Bribery Statute

Plaintiffs reference Minn. Stat. § 609.42, Minnesota's statute criminalizing bribery, but that statute unquestionably does not provide Plaintiffs a private cause of action.  Under Minnesota law, "a criminal statute does not automatically give rise to a civil cause of action unless the statute expressly or by clear implication so provides." *Larson v. Dunn*, 460 N.W.2d 39, 47 n.4 (Minn. 1990); *e.g.*, Minn. Stat. § 609.226 (state dog-bite criminal also statute permitting private cause of action).  But the criminal bribery statute Plaintiffs cite contains no such language, and provides no private right of action "by clear

implication." *See generally* Minn. Stat. § 609.42.  It confers no private right of action upon Plaintiffs and has no plausible relationship whatsoever to this civil action.

> b)   *Plaintiffs cannot prevail on the merits of their preemption-based claims.*

Even if Plaintiffs had a private cause of action under each of the statutory and constitutional provisions they invoke, their claims nevertheless all fail on their merits. Plaintiffs make the novel and unsupported legal argument that the City cannot lawfully accept election-administration grant funds from a private grant-making organization because such grants are "preempted" under various federal and state laws.  Their argument rests on a theory of conflict preemption, but conflict preemption exists only "when it is impossible for a private party to comply with both state and federal law, and when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of the relevant agency.'"  *Wuebker v. Wilbur-Ellis Co.*, 418 F.3d 883, 887 (8th Cir. 2005) (alteration omitted) (quoting *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000)).  Neither condition exists here, for any of the laws Plaintiffs cite.

### (1)   Constitutional Provisions

The Supremacy Clause provides simply that the U.S. Constitution and federal law are the "supreme Law of the Land."  U.S. CONST., art. VI, § 2.  It is the source of federal preemption doctrine.  *See, e.g.*, *Delaware & Hudson Ry. Co., Inc. v. Knoedler Mfrs., Inc.*, 781 F.3d 656, 660-61 (3d Cir. 2015) ("Congressional power to preempt state law derives from the Supremacy Clause of the Constitution.").  But the Clause itself creates no conflict

here. It imposes no prohibition on municipal receipt of private funding for federal elections, and plaintiffs do not attempt to explain how it does.

Likewise, the Elections Clause does not conflict with the City's acceptance of private grant funds. The Elections Clause empowers states to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," and allows Congress "at any time by law [to] make or alter such Regulations." U.S. CONST., art. I, § 4, cl.1. The "Elections Clause has two functions. Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). Consequently, "[i]n practice, the Clause functions as a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *Id*. (internal quotation marks omitted).

Plaintiffs do not seem to contest that the City's acceptance of grant funds does nothing to regulate the times or places of holding elections. But neither does it affect the "manner" of holding elections: the Supreme Court has taken the "commonsense view [that] that term encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'" *Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Minnesota Voters All. v. Walz,* No. 20-CV-1688 (PJS/ECW), 2020 WL 5869425, at *10

(D. Minn. Oct. 2, 2020) (relying on *Cook* to reject preliminary injunction sought in Elections Clause challenge to governor's executive order requiring masks be worn indoors, including at polling places). Those subjects are all addressed by Minnesota law. *See, e.g.*, Minn. Stat. chs. 201 (voter eligibility and registration), 203 (absentee voting), 204B (conduct of elections), 204C (Election Day activities), 206 (electronic voting systems); Minn. Stat. §§ 609B.139-144 (election-related crimes). By contrast, the way in which states and their political subdivisions fund elections is a very different matter from the mechanistic processes the Supreme Court described in *Cook* as examples of state regulations as to the "manner" of elections, and arguably the funding of election administration is not within the meaning of the Elections Clause at all. Moreover, Plaintiffs have identified no state law limiting permissible funding sources for local elections. Indeed, the CTCL grant will help ensure the City has the funding it needs to administer the election in the "manner" directed by state law, even under unprecedented pandemic conditions.[13]

Plaintiffs' contention that these constitutional provisions require that all election funding come from either federal or state sources does not reflect the longstanding structural reality nationwide. According to a recent Congressional Research Service report:

---

[13] Plaintiffs' citation to *U.S. Term Limits, Inc. v. Thornton*—which recognized that states may not "dictate electoral outcomes," "favor or disfavor a class of candidates," or "evade important constitutional restraints," 514 U.S. 779, 833-34 (1995)—is seriously misplaced. Acceptance and use of private funds to support and implement politically neutral federal and state electoral-administration goals does not run afoul of *Thornton*.

> States typically have primary responsibility for making
> decisions about the rules of elections (policymaking).
> Localities typically have primary responsibility for conducting
> elections in accordance with those rules (implementation).
> Localities, with varying contributions from states, typically
> also have primary responsibility for paying for the activities
> and resources required to conduct elections (funding).

*See* CONGRESSIONAL RESEARCH SERVICE, The State and Local Role in Election

Administration: Duties and Structures, (Mar. 4, 2019),

https://fas.org/sgp/crs/misc/R45549.pdf.  In short, accepting plaintiffs' theory that local

governments are powerless to receive funding other than that provided by state and federal

governments is not only unsupported by any legal precedent, it would also upend

longstanding, structural election-administration practices used in Minneapolis and around

the country.  *Id.*; *see also* Wachlarowicz Decl. ¶¶ 5-6.

### (2)   HAVA

HAVA permits distribution of federal funds to states for specified election-related

purposes.  Nothing in HAVA prohibits local jurisdictions (or states) from receiving private

grants for elections expenses.  In fact, HAVA expressly contemplates that elections will be

administered using funds "supplied by other sources" than HAVA.  52 U.S.C. § 21142(a).

Use of private grant funds does not make it "impossible" for local election offices to

comply with HAVA, nor would doing so "stand as an obstacle to accomplishing" the

statute's purposes.  *Wuebker*, 418 F.3d at 887.  HAVA is principally "concerned with

updating election technologies and other election-day issues at polling places."

*Democratic Nat'l Committee v. Republic Nat'l Committee*, 673 F.3d 192, 211 (3d Cir.

2012).  Private funding directed at improving those efforts (as CTCL funds are) does not impede HAVA's goals; it furthers them.

Neither does Plaintiffs' reference to the Election Assistance Commission ("EAC") established by HAVA conflict with the City's use of grant funds.  Plaintiffs offer no authority or explanation how it could.  *See* Br. at 23-25.  Indeed, Congress directed that EAC "shall not have any authority to issue any rule, promulgate any regulation, or take any other action which imposes any requirement on any State or unit of local government," except with respect to a provision of the NVRA authorizing EAC to develop a single, uniform application form to register by mail to vote.  52 U.S.C. § 20929.  In other words, Congress stated explicitly that EAC could not preempt state or local action in areas other than the uniform mail-in registration form—for example, in areas such as local election offices' funding sources.

Even aside from this clear congressional directive, the suggestion that EAC's bipartisan character bars the City from accepting CTCL's grant funds is simply wrong. First, as discussed above, the grant provides funds for neutral election-administration work to all jurisdictions that apply, without reference to political orientation.  In fact, EAC has partnered with CTCL in the past to provide free security trainings for local election offices around the country.  Marttila Ex. B.  And regardless, EAC would continue operating in a bipartisan way whether or not local elections office accept CTCL grants.

The cases Plaintiffs cite provide no assistance to their HAVA-preemption theory. *Washington Association of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006), is illustrative.  There, the district court enjoined Washington State's "matching statute"

which required the state to match a potential voter's name to one of two specified databases before allowing that person to register to vote. *Id*. at 1266-67. The district court held that because HAVA contained a matching provision that did not require applicants to be "matched prior to registration," the state statute, which did require pre-registration matching, directly conflicted with HAVA. *Id*. at 1268-69. As explained above, no such direct conflict exists here. If anything, *Reed* lends further credence to the notion that the grant funds would advance federal legislative goals. After all, "HAVA seeks to ensure that voting and election administration systems will be the most convenient, accessible, and easy to use for voters." *Id*. at 1268 (internal quotation marks omitted). That is precisely what CTCL funds are being used for: to make it easier and more efficient for all Minneapolis voters to cast ballots. Accordingly, there is simply no conceivable conflict between federal or state law and Minneapolis's use of federal election grants. *Cf. Kuznik v. Westmoreland County Bd. Of Cm'rs*, 902 A.2d 476, 479-80 (Pa. 2006) (holding that state law requiring referendum before purchase of replacement of lever voting machines was preempted by HAVA's express requirement "to replace lever machines with [electronic voting systems]").

Finally, Plaintiffs' theory of HAVA preemption defies common sense. Under their view, whenever a statute authorizes the federal government to give states grants to implement in a manner tailored to local needs (a common scenario in our federalist system), that statute somehow implicitly forbids states from receiving funds from any other source not mentioned in the statute. No court has adopted that extraordinary holding, and Plaintiffs point to none.

553268.1                                    36

(3)     NVRA

Plaintiffs' theory of NVRA preemption is similarly meritless.  Minnesota is exempt

from NVRA because it offers Election Day registration at polling sites.  *See* 52 U.S.C.

§ 20503(b)(2); *see also* Department of Justice, *NVRA Overview* (last accessed Oct. 8,

2020), https://www.justice.gov/crt/national-voter-registration-act-1993-nvra.  Plaintiffs do

not explain how a statute from which Minnesota is exempt could preempt a Minnesota city

from acting.  Additionally, the four sections of NVRA Plaintiffs cite, *see* Br. at 26 (citing

52 U.S.C. §§ 20504-07), do not prescribe or proscribe how local election-administration

work may be funded.  *See also Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012)

("[T]he NVRA regulates voter registration); 52 U.S.C. § 20501(b) (listing the purposes of

NVRA, none of which relate to limitations on funding sources).  Thus, Minneapolis's use

of private grant funds present no obstacle to the accomplishment and execution of those

provisions, which all relate to various voter-registration initiatives.  *See Wuebker*, 418 F.3d

at 887.  Indeed, to the extent that NVRA's stated purposes relate in large part to enhancing

ballot access and increasing voter participation, *see* 52 U.S.C. § 20501(b), NVRA's

purposes are furthered by using CTCL's grant funds.

(4)     Public-Private Partnerships, broadly

Insofar as Plaintiffs argue, untethered from any particular statutory or constitutional

authority, that public-private partnerships are unconstitutional in election administration,

the case law they point to is wholly inapplicable.  *Young v. Red Clay School District* did

not involve any sort of public-private funding agreement, and is irrelevant to the question

of whether Minneapolis may use private grant funds here.  *See generally* 122 A.3d 784.

Rather, *Young* challenged a strategic effort by a school district to encourage voting by voters deemed likely favorable toward its preferred outcome while discouraging or thwarting voting by those it deemed likely unfavorable. *Id.* As described above, Plaintiffs have not plausibly alleged that a similar dynamic exists here, much less offered any evidentiary support for that theory. The facts show the opposite to be true.

The two other cases Plaintiffs cite for this argument are no more helpful to them. *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), was an Establishment Clause case, and *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), presented a Fourth Amendment challenge against a state-run hospital—as with *Young*, neither involved a public-private partnership, permissible sources of election funding, elections of any sort, or any other topic relevant to this case.

Put simply, Plaintiffs cite no authority remotely tending to show that a private grant for politically neutral election-administration purposes is unconstitutional. Accordingly, they cannot prevail on the merits of this claim.

(5)    State bribery statute

Plaintiffs have not explained how using CTCL's grant funds could possibly constitute bribery. Under Minnesota's criminal bribery statute, any "public officer or employee [who] requests, receives, or agrees to receive, directly or indirectly," "any benefit, reward or consideration to which the person is not legally entitled" with "the understanding that it will have" an "influence [on] the person's performance of the powers or duties as such officer or employee" commits bribery. Minn. Stat. § 609.42, subd. 1(1)-(2). Even leaving aside the highly dubious prospect that securing a grant to be used by

one's employer in furtherance of that employer's official duties could possibly be a "benefit, reward or consideration" within the meaning of the statute, *see State v. Nelson*, A18-1482, 2019 WL 4164847, at *4 (Minn. App. Sept. 3, 2019) (defining those terms), Plaintiffs have not even pleaded, and cannot prove, any plausible connection between the grant and any corrupt "influence" the grant might be intended to have on City election officials' work.  As discussed above, the City's (and, according to all the evidence in the record, CTCL's) intentions actions are lawful and politically neutral.  Plaintiffs' bribery argument fails on the merits.

          2.     <u>Plaintiffs have identified no injury in fact, much less irreparable harm, they will suffer as a result of the grant.</u>

The cornerstone for any motion for injunctive relief "has always been irreparable harm and inadequacy of legal remedies." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)).  As discussed above, Plaintiffs have failed to identify how they are injured at all by the challenged grant.  A non-existent injury, by definition, is not an irreparable injury. Because Plaintiffs have shown *no* injury, much less an irreparable one, and have relied upon attenuated, speculative, and factually incorrect theories of causation, this *Dataphase* factor weighs heavily against them, rendering preliminary injunctive relief inappropriate. *See MPAY Inc. v. Erie Custom Comp. Appls., Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (holding that "speculative" and "uncorroborated" harms cannot support injunctive relief).

3.   <u>The City will be irreparably harmed if it is enjoined from using the grant funds, and the public interest is served by protecting all voters' ability to vote safely and securely.</u>

The City will be irreparably harmed by the injunction Plaintiffs seek because other currently available funding sources are not sufficient to cover the costs of safely, securely, and efficiently administering the 2020 general election.[14]  *See generally supra* at 5-8.  For this same reason, the final *Dataphase* factor—the public interest—cannot be reasonably debated.  The public's interest is served by elections in which all voters are able to cast ballots for the candidates of their choice, confident that they are not endangering themselves by doing so.

If the City is prevented from using the challenged grant to facilitate safe voting in the 2020 general election, that loss of funding will jeopardize the City's ability to conduct the election safely.  Wachlarowicz Decl. ¶ 17(f).  The City has acted in reliance on the

---

[14]  Insofar as Plaintiffs rely on one sentence in a report from the City Clerk to the City's Policy & Government Oversight Committee meeting on June 5, 2020, which described "plans and preparations related to the 2020 Presidential Election," that stated "No fiscal impact anticipated," *see* Kaardal Decl. Ex. D [ECF No. 10]; Br. 31-32, that reliance demonstrates a fundamental misunderstanding of the City's governance processes and the relevant facts.

There was "no fiscal impact anticipated" from the act of reporting on the City Clerk's plans and preparations related to the election.  Because the City's cost of administering elections is born largely, if not entirely, by the City itself, increases in election-administration costs necessarily have a fiscal impact on the City.  Wachlarowicz Decl. ¶ 19.  Furthermore, that report was dated June 5, 2020, before absentee voting began on June 18, 2020 for the August 2020 primary, and therefore before Elections and Voter Services could have known the magnitude of mail voting, the financial impacts of various court cases and consent decrees, and other contingencies affecting the cost of administering elections in the City.  *Id.*  Circumstances surrounding election administration can change rapidly, and administrators must be able to respond nimbly to those changes, to meet voters' needs.  *Id.*  Doing so often has a financial impact to the City, whether re-allocating existing funds, necessitating additional funds, or both.  *Id.*

grant funds it anticipates receiving by signing rental agreements for space and supplies, buying other PPE and safety materials outright, and permitting overtime by paid election workers.  Wachlarowicz Decl. ¶ 18.  If grant funds intended to cover those and other expenses suddenly become unavailable, Minneapolis voters would likely experience long lines and delays in casting in-person ballots and in having their absentee ballots processed, interfering with their rights to vote.  *Id*. ¶¶ 17(b), (e).  They will be assisted by poll workers who may not have access to the adequate PPE the grant would fund, and voters and staff alike may experience difficulty maintaining adequate physical distancing due to fewer early-voting options and fewer on-site protections, increasing public-health risks.  *Id.* ¶¶ 17(a), (c)-(e).  The loss of grant funds would mean the City would be unable to provide the 10 additional drop-off sites for mail ballots, and would be unable to hire enough staff and appoint enough Deputy City Clerks to manually process the absentee mail ballots it anticipates receiving or safely perform other administrative election functions.  *Id.* ¶ 17(a).  Ongoing training for poll workers, as well as absentee and early in-person voting efforts at some locations, would be interrupted and potentially suspended.  *Id.* ¶ 17(c).  Due to the contagious, airborne nature of COVID-19, these risks would be born not only by voters, but by *all* people in the region, in the form of increased transmission.  And because these changes would come in the middle of the statutory early-voting period, voters who have already made a voting plan that hinges on the availability of the grant-funded initiatives— for example, voters who are leery of voting at their polling places on Election Day and who did not request an absentee ballot because they planned to vote early and in person at one

of the City's early-voting sites—risk serious disruption of those plans, and may be unable
to vote at all.

These harms can be easily avoided by denying Plaintiffs' motion.  Minneapolis has
developed a thoughtful, comprehensive plan for safe voting.  Voters are already relying on
that plan as they make decisions about when, where, and by what method they will vote.
Impairing the City's ability to fully implement its safe voting plan for the full course of the
election would introduce added uncertainty into an already unprecedented and unsettling
situation.  As the Supreme Court recently emphasized in *Republican National Committee
v. Democratic National Committee*, "lower federal courts should ordinarily not alter the
election rules on the eve of an election."  140 S. Ct. 1205, 1207 (2020) (per curiam).  To
do so risks "voter confusion and consequent incentive to remain away from the polls.  As
an election draws closer, that risk will increase."  *Purcell v. Gonzalez*, 549 U.S. 1, 4-5
(2006) (per curiam).  As recently as a few weeks ago, another judge in this District relied
on this same principle in denying a preliminary injunction sought by a political
organization represented by Plaintiffs' counsel here.  *See Minnesota RFL Republican
Farmer Labor Caucus v. Freeman*, No. 19-cv-1949 (ECT/DTS), 2020 WL 5512509, at *6
(D. Minn. Sept. 14, 2020).  That decision was issued four days before early voting began
in Minnesota; by the time the Court holds the scheduled hearing on Plaintiffs' motion in
this case, the early-voting period will be half over, counseling even more strongly against
upending voters' expectations and plans about how to vote safely.

Given the lack of alternative funding sources, and the risks of voter suppression,
community contagion, and public confusion that Plaintiffs' requested relief would pose by

diminishing the City's ability to implement its safe-voting plan in the waning days of Minnesota's early-voting period, the City would be irreparably harmed by the requested injunction, and the public interest overwhelmingly favors denial of Plaintiffs' motion.

## IV.   CONCLUSION

For the reasons described above, the Court should deny Plaintiffs' motion for a temporary restraining order and dismiss its Complaint for lack of standing.

Dated:  October 9, 2020                    LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                          s/Charles N. Nauen
                                          Charles N. Nauen (#121216)
                                          David J. Zoll (#0330681)
                                          Kristen G. Marttila (#346007)
                                          100 Washington Avenue South, Suite 2200
                                          Minneapolis, MN 55401
                                          (612) 339-6900
                                          cnnauen@locklaw.com
                                          djzoll@locklaw.com
                                          kgmarttila@locklaw.com

                                          Gregory P. Sautter (#0326446)
                                          Assistant City Attorney
                                          City of Minneapolis
                                          City Hall, Room 210
                                          350 South Fifth Street
                                          Minneapolis, MN 55415
                                          (612) 673-2683
                                          gregory.sautter@minneapolismn.gov

                                          *Attorneys for Defendant*