UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance, Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson,<br><br>      Plaintiffs,<br><br>v.<br><br>City of Minneapolis,<br><br>      Defendant. | Civil No. 0:20-cv-02049-MJD-TNL<br><br>**DECLARATION OF GRACE WACHLAROWICZ IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** |

I, Grace Wachlarowicz, declare as follows.

    1.    I am the Assistant City Clerk Director of Elections & Voter Services for the City of Minneapolis and submit this declaration in support of Defendant's opposition to Plaintiffs' motion for temporary restraining order. I have held this role with Elections & Vote Services for 8 years.

    2.    It first came to my attention that the Center for Tech and Civic Life ("CTCL") COVID-19 Response grant was available, and that Minneapolis was eligible to apply, on August 20, 2020.

    3.    I consulted with the Minneapolis City Clerk, Casey Carl, and determined that this grant opportunity could potentially help alleviate the budget challenges facing the City with respect to the upcoming 2020 general election.

    4.    I promptly began working with my staff in Election and Voter Services, and other relevant City personnel, to prepare a grant application for the CTCL grant. That work began in earnest the week of August 24, 2020. A true and correct copy of the Minneapolis

553411.1

Vote Safe Plan that I ultimately submitted to CTCL to support the City's grant application is attached as **Exhibit 1**.

5. Typically, the cost of administering elections in the City is paid exclusively from the City's general fund. Only occasionally is supplemental funding available from the state and federal government. For example, in 2016, the City spent approximately $2.3 million to administer the general election alone. That money came entirely from the City's general fund. No funding came from the state or federal government to cover the City's costs in administering the 2016 general election. That is consistent with the City's experience in previous election cycles.

6. For 2020, the City will soon receive $284,229 in funds from Hennepin County's distribution of federal CARES Act funding for elections work specific to COVID-19. It has not received, and does not expect to receive, any other state or federal funds (including funding under the Help America Vote Act, or "HAVA") to defray its costs in administering the 2020 general election. A true and correct copy of the unexecuted Hennepin County grant distributing CARES Act funds to the City, which is currently out for signature, is attached at **Exhibit 2**.

7. The CARES Act funds are welcome, but will not cover the cost of administering the 2020 general election in a way that comports with the governor's state of emergency and public-health guidance, especially given the high voter-turnout rate we expect.

8. Given the current economic situation stemming from the pandemic and given the City's needs following the civil unrest this summer, it would be extremely difficult,

553411.1                                                                    2

and maybe impossible, to secure additional money from the City's general fund to adapt the City's election administration infrastructure to provide the safe, secure, and efficient voting experience City voters expect and deserve.

9. On **September 1, 2020**, as my staff and I continued to draft the grant application, we learned from public news reports that CTCL had received significant additional funding for the COVID-19 Response Grant Program from private donors Mark Zuckerberg and Pricilla Chan. The possibility of additional funding being available to other elections jurisdictions nationwide was welcome news, but neither the fact of the additional funding nor the identity of the individuals who made the donation had any influence on the City's decision to submit a grant application. As explained above, the City was already aware of the grant program and was already actively assembling its application materials.

10. Because of the size of the grant the City anticipated seeking, official approval from the City Council and the Mayor would be required to formally apply for the grant, and if CTCL awarded the amount requested, those entities would once again be required to approve the City's acceptance of the funds. At the same time, however, Election Day was rapidly approaching. To minimize the potential for delay, on **Friday September 4, 2020**, I submitted the first part of the City's application, the Minneapolis Safe Voting Plan. That document itemized a budget for how grant funds would be spent and included a narrative description to support that budget proposal. I did not submit a completed application form at that time, however, as official City approval would be required before I could do so.

11. On Thursday September 9, 2020, I was informed that the City's application was pre-approved, pending completion of the application form described above.

12. On Friday, September 11, 2020, I received an email from David Maeda, the Director of Elections at Minnesota's Office of the Secretary of State, informing recipients of the availability of CTCL grant funding for local elections jurisdictions. My understanding is that this email was sent to all counties in the state as well as to any other recipients, such as myself, who had signed up to be on the mailing list. (I previously had signed up for the mailing list through a link provided by the League of Minnesota Cities, and routinely received updates about elections from the Office of the Secretary of State.) A true and correct copy of this email is attached at **Exhibit 3**. The e-mail's attachments are not germane to this case and are not attached here, but can be provided if the Court requests them.

13. When the City Council met on Friday, September 18, 2020, it officially approved the proposal to apply for the CTCL grant. The Mayor approved the proposal on September 21, 2020. A true and correct copy of the official approval document is attached at **Exhibit 4**. I completed and the grant application form shortly thereafter.

14. CTCL awarded the City $2,297,342 in grant funds—the full amount requested—on September 30, 2020. A true and correct copy of the letter notifying the City of that award is attached at **Exhibit 5**.

15. On Friday, October 3, 2020, the City Council voted to accept the grant funds, and the mayor approved that action on Monday, October 5, 2020. A true and correct copy of the official approval document is attached at **Exhibit 6**. Due to the City's publication

requirements, this action will be become final, and the City will accept the grant funds, no sooner than October 10, 2020.

16. The City's grant-funded initiatives will benefit all Minneapolis voters, regardless of their political persuasion. All of the City's grant funds will be spent directly on improving the safety, security, and efficiency of casting a ballot and administering the election under unprecedented pandemic conditions. Those efforts do not favor or disfavor any group of voters.

17. Given the current fiscal situation at the City level, it would be extremely difficult to secure additional funds from the City to cover the initiatives that would be covered by the CTCL grant. If the Court orders the City not to use the funds, even temporarily, the City's would be unable to implement its Safe Voting Plan for the remainder of the election, and its ability to safely administer the election would be compromised. For example:

    a. The City would be unable to provide the 10 additional drop-off sites for mail ballots described in our Safe Voting Plan.

    b. The City would be unable to hire enough staff and appoint enough Deputy City Clerks to manually process in a timely way the absentee mail ballots we anticipate receiving.

    c. Ongoing training for poll workers and, as a result, absentee and early in-person voting efforts would be interrupted or suspended at some locations.

    d. Due to lack of funds for signage, materials, personal protective equipment, staffing and other expenses described in the grant application, it would be

more difficult to maintain recommended levels of physical distancing, increasing the health risk to voters, election staff, and poll workers.

   e. If early-voting options must be stopped or scaled back due to lack of funding, that likely will further exacerbate the difficulty voters and staff will experience in maintaining adequate physical distancing at in-person polling locations, and will lead to long lines at polling locations.

   f. The resulting service levels would jeopardize the City's ability to conduct the 2020 general election safely.

18. My office has acted on reliance of the CTCL grant funds we anticipate receiving, by signing rental and leasing agreements for space and supplies, buying other PPE and safety supplies and materials outright, and permitting overtime by paid elections workers.

19. I have reviewed the document filed in this case at D-3 to Erick Kaardal's Declaration, reporting on "plans and preparations related to the 2020 Presidential Election," I have reviewed that report, including the statement on the third page that "No fiscal impact anticipated." Within the context of this document, that statement means that no fiscal impact was anticipated from making the report to the City's Policy & Government Oversight Committee, not that, at that time, no fiscal impact was anticipated from administering the election. Because the City's cost of administering elections is born largely, if not entirely, by the City itself, increases in election-administration costs necessarily have a fiscal impact on the City. Furthermore, that report was dated June 5, 2020, before absentee voting began on June 18, 2020 for the August 2020 primary, and

therefore before Elections and Voter Services could have known the magnitude of mail voting, the financial impacts of various court cases and consent decrees, and other contingencies affecting the cost of administering elections in the City. Circumstances surrounding election administration can change rapidly, and administrators must be able to respond nimbly to those types of changes, to meet voters' needs. Doing so often has a financial impact to the City, whether re-allocating existing funds, necessitating additional funds, or both.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of October, 2020, Minneapolis, Minnesota.

s/Grace Wachlarowicz<br>
Grace Wachlarowicz