UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance, Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson,<br><br>Plaintiffs,<br>vs.<br><br>City of Minneapolis,<br><br>Defendant. | Case No.  0:20-CV-02049-MJD-TNL<br><br><br>**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

Minnesota Voters Alliance, inclusive of all plaintiffs, file this reply memorandum focusing on arguments raised in the Minneapolis response memorandum.[1]

## ARGUMENT

**I.   The Center for Tech and Civic Life is distributing $250,000,000 to cities and counties to privately fund federal elections—Minneapolis is one of them.**

The Center for Tech and Civic Life (CTCL) is in the process of distributing $250,000,000 to cities and counties to privately fund federal elections.  Kaardal Decl. Ex. B.  CTCL started and continued its nationwide funding of counties and cities in April of 2020.  The current situation with CTCL funding is:

1. Injection of private funding into county and municipal elections circumvents State and Federal appropriation processes, violates protocols in HAVA state

---

[1] Due to the word limitations, in some instances, the Minnesota Voters Alliance relies on its opening memorandum as its reply to the Minneapolis response memorandum.

1

implementation plans, and results in inaccurate reporting under HAVA 254(a)(5);

2. HAVA (Help America Vote Act) , CARES Act (Coronavirus Aid, Relief, and Economic Security Act), and state appropriations for local elections in Michigan, Wisconsin, Pennsylvania and Minnesota remain sufficient for the 2020 election cycle, rendering CTCL funding unnecessary (Minnesota, after the primary, has an estimated $7,980,488 of CARES funds left to disburse);

3. When evaluated in context of the 2016 presidential election, CTCL grant funding patterns demonstrate partisanship in grant funding awards.

Kaardal Decl., Exhibit A (Stillwater Technical Solutions report Oct. 9, 2020) at 5-8 and Attachment A.  Nonetheless, the City of Minneapolis has applied for and agreed to accept $2,297,342 from CTCL for federal election purposes.  Wachlarowicz Decl., Exs. 4, 5, 6.

## II.     The Minnesota Voters Alliance has Article III standing based on their possible theories of harm.

The Minneapolis memorandum at pages 9 through 24 focuses on Minnesota Voters Alliance's standing to bring their claims.  Minnesota Voters Alliance agrees with Minneapolis that Article III standing is required, but disagree that Article III standing does not exist in this case.

To be sure, federal courts enforce a three-part test for Article III standing: that is the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 136 S.Ct. 1540, 1547 (2016).  The Supreme Court has long recognized that a person's right to vote is "individual and personal in nature." *Gill v. Whitford*, 138 S.Ct. 1916, 1929 (U.S. 2018), *quoting*, *Reynolds v. Sims,* 377 U.S. 533, 561 (1964).  Thus, "voters who allege

facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Gill,* 138 S.Ct. at 1929, *quoting Baker,* 369 U.S. 186, 206 (1962).

Importantly, the Supreme Court in 2018 expressed an openness to standing based on other "possible theories of harm." *Gill*, 138 S.Ct. at 1931. Minnesota Voters Alliance is presenting several other possible theories of harm in this case. Minnesota Voter Alliance's theories of harm do not rely on the speculative nature of third parties (e.g., voter fraud or vote dilution), but rely on the City of Minneapolis accepting the private financing of its federal elections and the Court acknowledging standing based on a "possible theory of harm" to Minnesota Voters Alliance if their legal claims are held to be correct by the Court. The Minneapolis memorandum fails to persuasively argument against these "possible theories of harm."

As a preliminary matter, the favorable decision sought in this motion is to stop the private financing of the City of Minneapolis's federal election, not to invalidate the Presidential and Congressional election process in Minnesota. The Louisiana Attorney General on October 2, 2020, initiated similar litigation in Louisiana state court to stop private funding of federal elections there—presumably to stop the invalidation of Presidential and Congressional elections there. Kaardal Decl., Ex. C.

First, for standing purposes, absent an injunction, the private financing of federal elections, as a violation of the Elections Clause invalidates the federal elections, causing injury to Minnesota Voters Alliance because it won't have representation in Congress and in the Electoral College. In other words, when the City of Minneapolis violates the Elections Clause by accepting private financing, it invalidates the election under the Elections Clause;

3

the City of Minneapolis thereby deprives the Minnesota Voters Alliance of representation in Congress and in the Electoral College, as opposed to other states who will still be represented in Congress and in the Electoral College.

The U.S. Supreme Court in 2002 split on the meaning of "election" under the Minnesota Constitution. *Republican Party of Minnesota v. White*, 536 U.S. 765, 805 (2002) (dissenting opinion) (Ginsburg, J.) ("I do not agree with this unilocular, 'an election is an election,' approach). Here, similarly, the federal courts are called to interpret what an "election" is, but this time under the Elections Clause, when a local subdivision of a government accepts millions of dollars for purposes of a federal election.

The injury of Minnesota Voters Alliance's lack of representation in Congress and in the Electoral College is fairly traceable to the City of Minneapolis's conduct in accepting the private federal election grant, not speculative, and can be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (listing elements for standing). The Minnesota Voters Alliance's injury is distinguishable from the general public because other states whose counties and cities do not accept CTCL private federal election grants will still have representation in Congress and in the Electoral College.

Second, voter standing regarding federal elections exists when the government favors demographic groups the same way it does when the government disfavors demographic groups. The court in *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) summarized this way, "[p]arity of reasoning suggests that a government can violate the [Delaware] Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." In a similar way, CTCL's private federal

4

election grants cause the government to violate neutrality which injures the Minnesota Voters Alliance even by the appearance of the impropriety of a core public responsibility as it relates to the credibility and integrity of election outcomes when private moneys are injected into the election process as CTCL has. In other words, the injury is caused by the grant's attempt to promote or exceed the historical voting of progressive demographic groups within the City of Minneapolis.

The U.S. Constitution, Article I's Elections Clause and Article VI's Supremacy Clause preempts CTCL's private federal elections grant to local governments. The Elections Clause states:

> Time, place, and manner of holding. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators.

U.S. Constitution, Art. I, sec. 4, cl. 1. The Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections, *e.g., Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986) but does not authorize them to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints, *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 833-43 (1995)

Third, the Minnesota Voters Alliance also has standing because the private federal election grants tortiously interfere with their Election Clause rights to fair, equal, and uniform elections. *C.f. Gill*, 138 S.Ct. at 1931. As the supreme law of the land, the Constitution forms the basis of an important social contract between the citizenry and their government. Here, the government promises to execute its trust faithfully, leaving to the people the right to rebel in case the government breaks the terms of the contract, or, in

other words, violates the constitution. While the Constitution establishes an open-ended association and transforms its parties in relation to that association, elements of obligations between the parties exist. This is the social contract of the Election Clause with the people as third-party beneficiaries.

Tortious interference with prospective contractual relations involves a showing that the defendant "intentionally and improperly interfere[d] with another's prospective contractual relation" and requires that the defendant (1) induced or otherwise caused a third person not to enter into or continue the prospective relation, or (2) prevented the other from acquiring or continuing the prospective relation. *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn.1982) (quoting Restatement (Second) of Torts § 766B (1979)). As to third party beneficiaries, a person is an intended beneficiary if (1) the beneficiary's right to performance reflects the intent of the parties to the contract; and (2) performance of the contract "satisf[ies] an obligation of the promisee to pay money to the beneficiary [the duty owed test]; or ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance [intent-to-benefit test]." *Id.* (quoting Restatement (Second) of Contracts § 302 (1979)). As *Hickman* summarizes, "if recognition of third-party rights is 'appropriate' and either the duty owed test or the intent to benefit test is met, the third party can recover as an 'intended beneficiary.' " *Id.* at 369–70 (quoting Restatement (Second) of Contracts § 302 (1979)).

Minnesota Voters Alliance is a third party beneficiary of Minneapolis conducting federal elections because, by those elections, Minnesota Voters Alliance will be represented in Congress and in the Electoral College. Minneapolis and CTCL knew of the Minnesota

Voters Alliance's third party beneficiary rights, arising from legal and contractual relationships between the federal government and the state, to fair, equal and uniform elections. Minnesota Voters Alliance claims that private federal election grants are not allowed under federal law. If so, CTCL's private federal election grant to the City of Minneapolis tortiously interferes with the Minnesota Voters Alliance's third party beneficiary rights to fair, equal, and uniform elections—and to representation in Congress and in the Electoral College.

## II. Minnesota Voters Alliance has satisfied the legal requirement of probability of success on the merits for a temporary restraining order to issue.

The Minneapolis memorandum at pages 24 through 43 focuses on Minnesota Voters Alliance's failure to satisfy the legal requirements for preliminary injunctive relief. Minnesota Voters Alliance disagrees with Minneapolis that it has not met the legal standard for granting the temporary restraining order. In this reply memorandum, the focus is on probability of success on the merits.

First, federal law preempts private federal election grants to counties and cities. There is no legal authority under the Elections Clause nor 52 U.S.C. § 20901 for local governments to accept and use private federal election grants. Counties and cities, as political subdivisions of States, have no power to have federal election policies under the Elections Clause. U.S. Const., art. I, § 4, cl. 1. The Election Clause's phrase "manner of holding elections" for Senators and Representatives "refers to the entire electoral process, from the first step of registering to the last step of promulgating honest returns." *U.S. v. Manning,* 215 F. Supp. 272, 284 (W.D. La. 1963). The Supreme Court has stated that the Elections Clause has two functions: "Upon the States it imposes the duty ('*shall* be

prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013).  The Supreme Court has held that the Elections Clause invests the state with power over Congressional elections subject to Congressional control.  *Inter Tribal Council of Arizona, Inc.,* 570 U.S. at 9.  So, the States have "no power qua sovereigns" regarding federal elections; whatever powers the States have regarding federal elections is because Congress allows it.  *Fish v. Kobach*, 840 F.3d 710, 731–32 (10th Cir. 2016).  Nor does the Constitution impose on the United States the costs incurred by Congress's alterations of federal elections, traditionally borne by the States.  *Voting Rights Coalition v. Wilson,* 60 F.3d 1411, 1416 (9th Cir. 1995).

To be sure, Governors and independent redistricting committees, established under state law, have been found constitutionally permissible under the Elections Clause.  *Smiley v. Holm,* 285 U.S. 355 (1932); *Arizona State Legislature v. Arizona Independent Redistricting Com'n,* 576 U.S. 787 (2015).  But, in contrast, counties and cities which are political subdivisions of the state have never been held to be sovereigns for federal election policies.

Second, under the Elections Clause, the States and their political subdivisions (counties and cities) cannot dictate federal election outcomes; instead, fair and uniform federal elections are required. From the time of the Elections Clause, the States were to prescribe the "time, place and manner" of U.S. House of Representatives elections subject to Congressional enactments.  After 1913, the year the Seventeenth Amendment was enacted, states elected their U.S. Senators instead of the state legislatures appointing U.S. Senators.

After 1913, the States were required to prescribe the "time, place and manner" of elections of U.S. Senators as they had been doing for Representatives of the U.S. House—again subject to Congressional enactments.

Under the Elections Clause, the States and their political subdivisions (counties and cities) cannot favor or disfavor candidates.  The Supreme Court in *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, (1995), held unconstitutional an Arkansas law that prohibited the candidacy of an otherwise eligible Congressional candidate if he or she had already served three terms in the House of Representatives or two terms in the Senate. The Supreme Court held that the ballot restriction was an indirect attempt to impose term limits on congressional incumbents that violated the Qualifications Clauses in Article I of the Constitution rather than a permissible exercise of the State's power to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives" within the meaning of Article I, § 4, cl. 1.  Similarly, the Supreme Court held unconstitutional an initiative amending the Missouri Constitution to require that any failure of United States Senators or Representatives, or nonincumbent candidates for those offices, to support term limit provisions be noted on federal election ballots.  *Cook v. Gralike*, 531 U.S. 510, 511 (2001).

The States and their political subdivisions (counties and cities) under the Elections Clause also cannot favor a demographic group.  A government favoring a demographic group, similar to the government disfavoring a demographic group, skews election outcomes.  "Parity of reasoning suggests that a government can violate the [Delaware] Elections Clause if it skews the outcome of an election by encouraging and facilitating voting

9

by favored demographic groups." *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

*Red Clay Consol. Sch. Dist.* reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group. The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law. The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.* The court stated that the government favoring a demographic group caused equivalent injury to a voter as the government disfavoring a demographic group. *Id.*

Under the Elections Clause, States and their political subdivisions are not to circumvent constitutional or other federal legal restrictions—which includes the Elections Clause and federal statutes on federal elections.

Third, Elections Clause preemption is not subject to the Plain Statement Rule. The Plain Statement Rule requires that, when Congress intends to preempt state law, "it must make its intention to do so 'unmistakably clear in the language of the statute.' " *Gregory*, 501 U.S. 452, 460 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)). However, because Congress's regulation of federal elections displaces state regulations, and because the states have no power as sovereigns to regulate such elections, the plain statement rule, as a creature of the presumption against preemption, has no work to do in the Elections Clause setting; it is unnecessary to prevent inadvertent or ill-considered

preemption from altering the traditional state-federal balance. *Fish v. Kobach*, 840 F.3d 710, 731–32 (10th Cir. 2016), *citing Inter Tribal*, 133 S.Ct. at 2257 & n.6.

Importantly, recognizing the uniqueness of the Election Clause, the Ninth and Tenth Circuits apply a canon of statutory interpretation considering "the relevant congressional and state laws as part of a single statutory scheme but treating the congressional enactment as enacted later and thus superseding any conflicting state provision." *Fish v. Kobach*, 840 F.3d 710, 726 (10th Cir. 2016), *citing Gonzalez v. Arizona*, 677 F.3d 383, 394 (C.A.9 (Ariz.), 2012).

Fourth, Title 52 of the United States Code (52 U.S.C.), entitled "Voting and Elections", is a codification of the "general and permanent" voting and election laws of the United States federal government. Subtitle I covers "Voting Rights." 52 U.S.C. §§ 10101 – 10702). Subtitle II covers "Voting Assistance and Election Administration." 52 U.S.C. §§ 20101 – 21145. Subtitle III covers "Federal Campaign Finance" 52 U.S.C. §§ 30101 – 30146. 52 U.S.C. § 21141 defines "State:"

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

Counties and cities are not states. Consistent with the Elections Clause, Title 52 imposes federal legal requirements on the States and their political subdivisions regarding federal elections.

52 U.S.C. § 20901, titled "Payments to States for activities to improve administration of elections," establishes an exclusive prerogative for the federal government to grant funds to states to improve administration of federal elections: 52 U.S.C. § 20901 requires the States to use federal moneys to implement federal policy regarding federal elections:

11

>(b)USE OF PAYMENT
>(1)IN GENERAL A State shall use the funds provided under a payment made under this section to carry out one or more of the following activities:  (A) Complying with the requirements under subchapter III.  (B) Improving the administration of elections for Federal office…
>(c)USE OF FUNDS TO BE CONSISTENT WITH OTHER LAWS AND REQUIREMENTS In order to receive a payment under the program under this section, the State shall provide the Administrator with certifications that—(1) the State will use the funds provided under the payment in a manner that is consistent with each of the laws described in section 21145 of this title, as such laws relate to the provisions of this chapter; and (2) the proposed uses of the funds are not inconsistent with the requirements of subchapter III.

Thus, federal election moneys are distributed to the States under the federal policy limitations of 52 U.S.C. § 20901. The States then determine how much of the money is distributed locally.

On December 20, 2019, prior to the COVID-19 pandemic, the federal Consolidated Appropriations Act of 2020 was signed into law. Public Law No: 116-94 (Dec. 20, 2019). The Act included $425 million in new Help America Vote Act (HAVA) funds, made available to states to improve the administration of elections for Federal Office, including to enhance technology and make election security improvements.  On March 27, 2020, in response to the COVID-19 pandemic, the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was signed into law.  Public Law No. 116-136 (Mar. 27, 2020). The Act included $400 million in new Help America Vote Act (HAVA) emergency funds, made available to states to prevent, prepare for, and respond to the coronavirus for the 2020 federal election cycle.  The States, consistent with 52 U.S.C. § 20901, distributed most of the federal moneys to the counties and cities for federal election purposes.  The counties and cities are bound by the federal policy limitations of 52 U.S.C. § 20901.

There is no legal authority under the Elections Clause nor 52 U.S.C. § 20901 for

counties and cities, which are political subdivisions of the States, to accept and use private federal election grants. The Elections Clause does not authorize the political subdivisions of the State to have federal election policies. 52 U.S.C. § 20901 authorizes federal payments to States for the purpose of improving election administration. The states, in turn, distribute money to the counties and cities as their respective political subdivisions. 52 U.S.C. § 20901 does not authorize private federal election grants to counties and cities. Private federal election grants to counties are legally unauthorized.

Dated: October 12, 2020.    /s/Erick G. Kaardal
Erick G. Kaardal, 229647
Special Counsel for Amistad Project of the Thomas More Society
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis Minnesota 55402
Telephone: (612) 341-1074
Facsimile: (612) 341-1076
Email: kaardal@mklaw.com
*Attorneys for Plaintiffs*