# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MINNESOTA VOTERS ALLIANCE, et al.,

       Plaintiffs,

v.
         **MEMORANDUM OF LAW & ORDER**
         Civil File No. 20-2049 (MJD/TNL)

CITY OF MINNEAPOLIS,

       Defendant.

Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A., Counsel for Plaintiffs.

Gregory P. Sautter, Office of the City Attorney; and Charles N. Nauen, Kristen G. Marttila, and David J. Zoll, Lockridge Grindal Nauen P.L.L.P.; Counsel for Defendant.

## I.  INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Temporary

Restraining Order.  [Docket No. 7]

## II.  SUMMARY

Because Plaintiffs cannot show standing, the Court denies Plaintiffs'

motion.  The City of Minneapolis is one of 22 Minnesota municipalities[1] that

---

[1] (Marttila Decl., Ex. C. at 17, https://www.techandcivilife.org/amistad-statement/.)

applied for and was awarded a COVID-19 Response Grant from the Center for

Tech and Civic Life to assist with the substantial costs entailed with

administering an election during a global pandemic.  Plaintiffs allege no injury to

their right to vote caused by the City's actions.  For example, nowhere do they

allege that they will be unable to cast a ballot, or that they will be forced to

choose between voting under unsafe pandemic conditions and not voting at all.

The City's actions in applying for and accepting the grant and using the grant

money to improve all manners of voting in Minneapolis in the 2020 election

affect all Minneapolis voters equally.  All individual Plaintiffs are Minneapolis

voters.  Plaintiffs fail to explain how they will be uniquely affected by

Minneapolis's actions.

## III.   BACKGROUND

### A.   Factual Background

#### 1.   The Parties

Plaintiff Minnesota Voters Alliance is a non-profit Minnesota corporation

with the stated purpose of seeking public confidence in the integrity of

Minnesota's elections and protecting the constitutional rights of its members.

(Compl. ¶ 4.)  Plaintiffs Ronald Moey, Marissa Skaja, Charles Halverson, and

Blair Johnson are all members of the Minnesota Voters Alliance, residents of

Minneapolis, and eligible Minnesota voters. (Id. ¶¶ 4-8.)

Defendant City of Minneapolis (the "City") is a Minnesota municipality.

(Compl. ¶ 9.) The City administers elections and, typically, funds the entire cost

of administering elections within the City. (Wachlarowicz Decl. ¶ 5.) For

example, the City spent $2.3 million to administer the 2016 general election and

received no funding from the state or federal government to cover the City's

costs of administering that election. (Id.) The City's responsibility to self-fund

federal elections within its boundaries is typical. As a recent Congressional

Research Service report noted:

> States typically have primary responsibility for making decisions
> about the rules of elections (policymaking). Localities typically have
> primary responsibility for conducting elections in accordance with
> those rules (implementation). Localities, with varying contributions
> from states, typically also have primary responsibility for paying for
> the activities and resources required to conduct elections (funding).

See Congressional Research Service, The State and Local Role in Election

Administration: Duties and Structures, at Summary (Mar. 4, 2019), available at

https://fas.org/sgp/crs/misc/R45549.pdf (last visited Oct. 13, 2020).

### 2.    Center for Tech and Civic Life COVID-19 Response Grants

The Center for Tech and Civic Life ("CTCL") is a nonprofit organization

founded in 2012, with a goal of "working to foster a more informed and engaged

democracy, and helping to modernize elections."  (Compl. ¶¶ 26-27, 29.)  In June

2020, CTCL partnered with the U.S. Election Assistance Commission ("EAC"), a

bipartisan commission established by the Help America Vote Act of 2002

("HAVA"), Pub. L. No. 107–252, 116 Stat. 1666 (2002) (codified at 52 U.S.C. §§

20901-21145), to offer a free, three-part course on election cybersecurity to local

election offices across the country, particularly aimed at those with limited

technology resources.  (Marttila Decl., Ex. B.)  Plaintiffs assert that CTCL is a

progressive organization and points to the fact that its three founders previously

worked for the New Organizing Institute, which trained progressive groups and

Democratic campaigns in digital campaign strategies.  (Compl. ¶¶ 31, 38.)

Plaintiffs further claim that CTCL "targets urban cities for its private federal

election grants to turn out the progressive vote in the urban cities."  (Id. ¶ 38.)

This year, CTCL is providing COVID-19 Response Grants to local election

offices to help ensure they have the "staffing, training and equipment necessary

so this November every eligible voter can participate in a safe and timely way

and have their vote counted."  (Kaardal Decl., Ex. A at 1-3.)  CTCL awarded

4

COVID-19 Response Grants to various local election offices throughout the summer of 2020 to assist with the substantial costs entailed with administering an election during a global pandemic.  (Marttila Decl., Exs. D-E.)  On September 1, 2020, it was publicly announced that Mark Zuckerberg and Priscilla Chan would donate $250 million to CTCL to provide funding for additional COVID-19 Response Grants to local election offices.  (Compl. ¶¶ 36-37; Kaardal Decl., Ex. B at 2; Wachlarowicz Decl. ¶ 9.)

CTCL's grant program provides funding in four areas: ensuring safe and efficient administration on Election Day; expanding voter education and outreach efforts; launching poll worker recruitment, training, and safety efforts; and supporting early in-person and mail-in voting efforts.  (Marttila Decl., Ex. H at 4-5.)  Any local election office responsible for those types of election activities is eligible to apply to CTCL's COVID-19 Response Grant program; CTCL approves every eligible election department for a grant; and, unless the applicant specifically requests a lesser amount, each election department will receive a minimum award of $5,000.  (Id. at 2; Marttila Decl., Ex. G at 4.)  More than 1,100 jurisdictions have applied so far, in almost every state, with most applicants serving jurisdictions with fewer than 25,000 registered voters.  (Marttila Decl., Ex.

H at 1-3.)  In Minnesota, CTCL has awarded grants to a variety of local election offices, including Albertville, Becker, Watertown, and 19 other jurisdictions. (Marttila Decl., Ex. C. at 17.)

### 3.    The City's COVID-19 Response Grant

The City first became aware of its eligibility to apply for a CTCL grant on August 20, 2020.  (Wachlarowicz Decl. ¶ 2.)  City staff concluded that the grant could help alleviate the budget challenges facing the City as it prepared to administer the 2020 general election.  (Id. ¶ 3.)  During the week of August 24, the City began working to prepare a grant application.  (Id. ¶ 4.)

In 2020, the City will receive $284,229 from Hennepin County's distribution of federal CARES Act funding for election work specific to COVID-19.  (Wachlarowicz Decl. ¶ 6; Wachlarowicz Decl., Ex. 2.)  However, the City has not received and does not expect to receive any other state or federal funds, including HAVA funds, to defray the costs of administering the 2020 general election.  (Wachlarowicz Decl. ¶ 6.)  The City claims that the CARES Act funds do not cover the cost of administering a general election in a way that comports with the governor's state of emergency and public-health guidance during this global pandemic, particularly given the high voter turnout that the City

anticipates.  (Id. ¶ 7.)  The City asserts that, given the economic fallout from the pandemic and the City's needs following the civil unrest this summer, it would be extremely difficult to secure additional money from the City's general fund to adapt the City's election administration to provide a safe, secure, and efficient voting experience for City voters during this election.  (Id. ¶ 8.)

The City applied for $2,297,342 in grant funds from CTCL and was awarded the full amount requested.  (Wachlarowicz Decl. ¶¶ 13-14; Wachlarowicz Decl., Exs. 1, 4, 5.)  The City Council voted, and the Mayor agreed, to apply for and accept the grant funds, and the acceptance will occur on or after October 10, 2020, after publication requirements are satisfied.  (Wachlarowicz Decl. ¶¶ 13, 15; Wachlarowicz Decl., Exs. 4, 6.)

The City will allocate the grant money as follows:

| Use | Amount |
| --- | --- |
| **Absentee Ballot Assembly and Processing Equipment:** Additional staff and overtime Letter openers Facility expansion Vehicle rental Mailing and printing supplies | $2,082,312 ($1,816,203 of which is for expenses related to the general election, and $266,109 of which reimburses expenses from the August primary) |
| **Early Voting Sites and Ballot Drop-off Options:** Additional staff for primary Signage | $48,900 ($17,500 of which is for expenses relating to the general election, and $31,400 of which reimburses |

| Plexiglass barriers<br>Printing<br>Outdoor supplies | expenses from the August primary) |
|---|---|
| **In-person Voting at Polling Places on Election Day:**<br>Materials like tape to mark social distancing, electrical cords, and door stops<br>Printing for COVID-specific signage | $3,295 |
| **Secure Drop Boxes:**<br>Ballot boxes<br>Transfer containers<br>Outdoor supplies<br>Signage<br>Printing<br>Staff<br>Vehicle<br>Pallet jack | $82,525 |
| **Voter Outreach and Education** | $50,000 |
| **Personal Protective Equipment ("PPE"):**<br>Masks and face shields for staff and voters<br>Sanitizer<br>Disposable gloves | $30,310 |
| **TOTAL** | **$2,297,342** |

(Wachlarowicz, Ex.1 at 4-9.)

### B. Procedural History

On September 24, 2020, Plaintiffs filed a Complaint against the City in this Court, which asserts Count One: "The City of Minneapolis acts ultra vires, without legal authority, to form a public-private partnership for federal election administration with CTCL by accepting and using CTCL's private federal

election grant, because preemption applies under the Elections Clause,

Supremacy Clause, HAVA, and NVRA."

Plaintiffs now seek a temporary restraining order enjoining the City from

accepting or using CTCL's private federal election grant and any other private

federal election grant.

## IV.   DISCUSSION

### A.   Standing Standard

Before the Court can address the merits of Plaintiffs' motion, it must first

address the question of standing.

> To seek injunctive relief, a plaintiff must show that he is under
> threat of suffering "injury in fact" that is concrete and particularized;
> the threat must be actual and imminent, not conjectural or
> hypothetical; it must be fairly traceable to the challenged action of
> the defendant; and it must be likely that a favorable judicial decision
> will prevent or redress the injury.

Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citation omitted).  See also

Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157-58 (2014) ("To establish

Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient

'causal connection between the injury and the conduct complained of,' and (3) a

'likelihood' that the injury 'will be redressed by a favorable decision.'") (citation

omitted).

> This requirement assures that there is a real need to exercise the
> power of judicial review in order to protect the interests of the
> complaining party.  Where that need does not exist, allowing courts
> to oversee legislative or executive action would significantly alter
> the allocation of power . . . away from a democratic form of
> government.

Summers, 555 U.S. at 493 (citations omitted).

> A party invoking federal jurisdiction must support each of the
> standing requirements with the same kind and degree of evidence at
> the successive stages of litigation as any other matter on which a
> plaintiff bears the burden of proof.

Constitution Party of S.D. v. Nelson, 639 F.3d 417, 420 (8th Cir. 2011) (citing

Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  "At this stage, [the Court]

assume[s] that the allegations in the complaint are true and view them in the

light most favorable to [Plaintiffs]."  Jones v. Jegley, 947 F.3d 1100, 1103 (8th Cir.

2020).  Trial courts have "wide discretion" "to consider affidavits and other

evidence of 'disputed jurisdictional facts' at the pleading stage."  Id. at 1104 (8th

Cir. 2020) (citing Davis v. Anthony, Inc., 886 F.3d 674, 677 (8th Cir. 2018)).

## B.   Plaintiffs' Failure to Establish Standing

### 1. Alleged Statutory and Constitutional Violations and the Existence of a Private Right of Action

Plaintiffs assert that the City's act of applying for and accepting the CTCL grant is preempted by various statutes and constitutional provisions. They base their claim on conflict preemption.

"The general law of preemption is grounded in the Constitution's command that federal law 'shall be the supreme Law of the Land.' U.S. Const. art. VI, cl. 2." In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig., 621 F.3d 781, 791 (8th Cir. 2010). "Thus state law that conflicts with federal law has no effect." Id. (citation omitted). "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." Id. at 794 (citation omitted).

Plaintiffs' bare claims that the City has violated various laws are insufficient to satisfy the injury-in-fact requirement. The Supreme Court has

> consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

11

Lance v. Coffman, 549 U.S. 437, 439 (2007) (citation omitted).  Federal courts

"refus[e] to serve as a forum for generalized grievances" that do not reflect a

personal stake in the resolution of the issues sought to be adjudicated.  Id.  When

"[t]he only injury plaintiffs allege is that the law . . . has not been followed," that

"is precisely the kind of undifferentiated, generalized grievance about the

conduct of government that [federal courts] have refused to countenance."  Id. at

442; see also id. at 439-42 (collecting and examining cases).

### 2.   Existence of a Private Right of Action

Plaintiffs' arguments that the statutes or constitutional provisions under

which they sue provide them private rights of action cannot establish standing.

The fact that a statute provides a private right of action is insufficient to provide

standing.  See, e.g., Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547-48, (2016).

Conversely, when it is clear that Plaintiffs do not have a private right of

action, Plaintiffs do lack standing to assert that claim.  "Because standing is

determined by the specific claims presented, whether [the plaintiffs] have

standing depends on whether the statute at issue[] creates an express or implied

private right of action."  Howe v. Ellenbecker, 8 F.3d 1258, 1261 (8th Cir. 1993)

(citations omitted), abrogated by Blessing v. Freestone, 520 U.S. 329 (1997).

12

When analyzing standing, "[a] federal court must ask 'whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.'" Roberts v. Wamser, 883 F.2d 617, 620 (8th Cir. 1989) (quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)). "Without a private right of action to enforce [the statute under which he or she sues], [the plaintiff] lacks standing to bring suit in federal district court." Leach v. Mediacom, 240 F. Supp. 2d 994, 996 (S.D. Iowa 2003), aff'd, 373 F.3d 895 (8th Cir. 2004) (citing Warth, 422 U.S. at 500–01; Howe, 8 F.3d at 1261).

Here, Plaintiffs clearly lack a private right of action under four of the five statutes and constitutional provisions upon which they rely.

### a)  Supremacy Clause

The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const., art. VI, § 2. The Supremacy Clause is the source of federal preemption doctrine. See, e.g., Del. & Hudson Ry. Co., Inc. v. Knoedler Mfrs.,

Inc., 781 F.3d 656, 660-61 (3d Cir. 2015) ("Congressional power to preempt state law derives from the Supremacy Clause of the Constitution . . . .").

The Supreme Court has explicitly held that the Supremacy Clause "certainly" does not create a private right of action.  Armstrong v. Exceptional Child Ctr., Inc., 135 S. Ct. 1378, 1383 (2015).  Therefore, to the extent Plaintiffs assert a claim based solely on the assertion that the City's action is barred or preempted by the Supremacy Clause, they lack standing.

### b)   HAVA

In the wake of the 2000 presidential election, Congress enacted HAVA.  HAVA's purpose as set forth in the preface is:

> To establish a program to provide funds to States to replace punch card voting systems, to establish the Election Assistance Commission to assist in the administration of Federal elections and to otherwise provide assistance with the administration of certain Federal election laws and programs, to establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and for other purposes.

Crowley v. Nev. ex rel. Nev. Sec'y of State, 678 F.3d 730, 734 (9th Cir. 2012).

HAVA does not create a private right of action.  See, e.g., Am. Civil Rights Union v. Philadelphia City Comm'rs, 872 F.3d 175, 184-85 (3d Cir. 2007).

"Congress established only two HAVA enforcement mechanisms: (1) a civil

14

action brought by the Attorney General, and (2) a state-based administrative complaint procedure." Bellitto v. Snipes, 935 F.3d 1192, 1202 (11th Cir. 2019) (citing 52 U.S.C. §§ 21111, 21112). See also Brunner v. Ohio Republican Party, 555 U.S. 5, 6 (2008) (vacating temporary restraining order because there is likely no private right of action under HAVA based on a private litigant's claim of vote dilution).

The fact that HAVA requires states to create an administrative procedure to allow filing of HAVA complaints that provides the "appropriate remedy" if the state determines that there was a violation, 52 U.S.C. § 21112(a), and that Plaintiffs consider Minnesota's procedure to be inadequate because it does not allow for temporary restraining orders does not provide a basis for creation of a private right of action. First, there is no indication that Minnesota's HAVA complaint procedure is inadequate: HAVA lists the requirements for a state administrative procedure, and Plaintiffs fail to cite to any of these listed requirements that are not fulfilled by Minnesota's complaint procedure. See 52 U.S.C. § 21112(a)(2); Minn. Stat. § 200.04. (See also Marttila Decl., Ex. J, Minn. HAVA Elections Complaint Form.) HAVA requires a state to make a determination within 90 days of the filing of the complaint, not any lesser period

of time, and it does not require expedited equitable relief.  52 U.S.C. §

21112(a)(2)(H).  Minnesota's procedure requires a final determination, including

if necessary, a remedial plan, "no later than 90 days after the filing of the

complaint."  Minn. Stat. § 200.04, subds. 2(f), 3(f).  Second, regardless of the

structure of Minnesota complaint system, the Attorney General has the ability to

"bring a civil action against any State or jurisdiction . . . . for such declaratory and

injunctive relief (including a temporary restraining order, a permanent or

temporary injunction, or other order) as may be necessary."  52 U.S.C. § 21111.

Third, even if Minnesota's administrative procedure were inadequate, HAVA

provides the remedy for inadequate procedures – if inadequate procedures are

found during a federal audit, the state is to return that portion of the HAVA

funds that were affected.  See 52 U.S.C. §§ 21142(b)(1), (c).

Because HAVA does not provide Plaintiffs a private right of action, they

lack standing to assert a claim under HAVA.

### c)  National Voters Registration Act

Plaintiffs also claim that the National Voter Registration Act, 52 U.S.C. §§

20501-20511 ("NVRA") preempts the City's acceptance and use of the CTCL

grant.  The purposes of the NVRA are

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).  Through the NVRA, Congress enacted national requirements for voter registration for federal elections.  See 52 U.S.C. § 20503, 20504.  Minnesota is exempt from the NVRA.  See 52 U.S.C. § 20503(b)(2); see also Department of Justice, NVRA Overview at https://www.justice.gov/crt/national-voter-registration-act-1993-nvra (last visited Oct. 15, 2020).

Plaintiffs have no standing to bring a claim under the NVRA.  First, the NVRA only permits a private right of action for individuals who are "aggrieved by a violation" of the statute, 52 U.S.C. § 20510(b)(1), that is "persons who allege that their rights to vote in an election for federal office have been impaired by a violation of the NVRA."  Dobrovolny v. Neb., 100 F. Supp. 2d 1012, 1031 (D. Neb. 2000).  see also Krislov v. Rednour, 946 F. Supp. 563, 566 (N.D. Ill. 1996) ("Standing under the NVRA is limited to the United States Attorney General and

the 'aggrieved persons' whose voting rights have been denied or impaired."). Plaintiffs do not allege that their ability to vote in the 2020 election is in any way impaired by the City's actions. Minnesota Voters Alliance does not have the ability to vote. Individual Plaintiffs are all Minnesota voters who reside in Minneapolis. As Minneapolis voters, they are beneficiaries of the City's use of the grant money to make voting safer and more efficient. An attenuated argument that Plaintiffs will be unhappy with the election results if their fellow Minneapolis residents can also safely vote during a pandemic does not show that Plaintiffs' own voting rights have been impaired or denied. Second, Minnesota is exempt from the NVRA. There is no basis to conclude that a statute, from which Minnesota is exempt, grants a private right of action for Plaintiffs to sue claiming that the statute preempts a Minnesota city from acting to enhance Plaintiffs' ability to vote.

### d)   Minnesota Criminal Bribery Statute

Plaintiffs also base their claim on Minnesota Statute § 609.42, subdivision 1(2). The statute provides:

> Whoever does any of the following is guilty of bribery and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both:

18

(1) offers, gives, or promises to give, directly or indirectly, to any person who is a public officer or employee any benefit, reward or consideration to which the person is not legally entitled with intent thereby to influence the person's performance of the powers or duties as such officer or employee; or

(2) being a public officer or employee, requests, receives or agrees to receive, directly or indirectly, any such benefit, reward or consideration upon the understanding that it will have such an influence; . . .

Minn. Stat. § 609.42, subd. 1.

Plaintiffs asserts that the City's acceptance and use of CTCL's grant without a state legislative enactment approving the grant constitutes bribery under subdivision 1(2), because the City allegedly accepted the grant money in order to induce progressive voters to vote in an election.

Under Minnesota law, "a criminal statute does not automatically give rise to a civil cause of action unless the statute expressly or by clear implication so provides." Larson v. Dunn, 460 N.W.2d 39, 47 n.4 (Minn. 1990). The criminal bribery statute Plaintiffs cite contains no language providing a civil cause of action and provides no private right of action "by clear implication." The Court concludes that there is no private right of action under § 609.42. Therefore, Plaintiffs lack standing to assert such a claim.

### 3. Injury Based on the Allegation that the City Is Favoring a Particular Demographic Group

Overall, Plaintiffs assert that they have standing because the City is

favoring a particular demographic group – urban progressives – and thereby,

suppressing individual Plaintiffs' vote.  (Minnesota Voters Alliance does not

have the right to vote.)  Plaintiffs do not allege that the City is taking any action

that is aimed at progressive voters in particular.  Rather, Plaintiffs theorize that,

by virtue of the fact that the majority of the City's voters are progressive, any

action that the City takes to encourage or facilitate voting in general necessarily

favors the demographic group that makes up the majority of the City's voters.

Plaintiffs rely on Young v. Red Clay Consolidated School District, in which the

Delaware Chancery Court held that "a government can violate the Elections

Clause if it skews the outcome of an election by encouraging and facilitating

voting by favored demographic groups."  122 A.3d 784, 858 (Del. Ch. 2015).

To the extent that Plaintiffs prefer a particular outcome in the 2020 federal

election, that preference is an interest "'in their collective representation in

[government],' and in influencing the [government's] overall 'composition and

policymaking."  Gill v. Whitford, 138 S. Ct. 1916, 1931 (2018) (citation omitted).

Such an interest is an "'undifferentiated, generalized grievance about the

20

conduct of government'" that generally does not present "an individual and personal injury of the kind required for Article III standing." Id. (citation omitted). "A citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative. And the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable 'general interest common to all members of the public.'" Id. (citation omitted).

Plaintiffs allege no injury to their right to vote. For example, nowhere do they allege that they will be unable to cast a ballot, or that they will be forced to choose between voting under unsafe pandemic conditions and not voting at all. The City's actions in applying for and accepting the CTCL grant and using the grant money to improve all manners of voting in Minneapolis in the 2020 election affect all Minneapolis voters equally. All individual Plaintiffs are Minneapolis voters. Plaintiffs fail to explain how they will be uniquely affected by Minneapolis's actions. They assert that, because Minneapolis voters are statistically more likely to be progressive, Minneapolis's actions enhancing voting in general favor progressive voters and thereby suppress Plaintiffs' votes. However, as Minneapolis residents, Plaintiffs, themselves, are equal recipients of Minneapolis's actions to make voting safer during the pandemic. The City's

grant-funded expenditures will make it easier for the individual Plaintiffs to vote

safely for the candidates of their choosing and to have those ballots processed

promptly, no matter which method of casting a ballot they choose.  Grant money

will be used to assist with mail-in voting; voting by absentee ballots via a secure

drop box; voting in person at early-voting sites; voting in-person on Election

Day; and voter education to assist voters in choosing how to vote.

(Wachlarowicz Decl., Ex.1 at 6-9.)

     This is not a case like Young v. Red Clay Consolidated School District, in

which the plaintiffs claimed that their votes were suppressed to the extent that

they were unable to vote due to the school district's selective actions encouraging

and assisting voting by students and families to the detriment of elderly voters

and voters with disabilities.  122 A.3d at 858.  Here, Plaintiffs make no allegation

that they are unable to access the polls as a result of the City's expenditures

funded by the grant.  Additionally, the school district in Young made a strategic

decision to use demographic targeting expressly intended to "diminish[] the

voting rights of one portion of the electorate and enhance[] the voting rights of

another portion of the electorate."  Id.  Plaintiffs make no allegation that the City

will spend grant funds to encourage only one portion of the City's electorate to

vote and to discourage another portion of the City's electorate.  Here, the City

has sought grant funds to facilitate safe voting by all eligible voters within its

boundaries, which includes Plaintiffs.

In sum,

[t]he only injury plaintiffs allege is that the law—specifically the
Elections Clause—has not been followed.  This injury is precisely the
kind of undifferentiated, generalized grievance about the conduct of
government that we have refused to countenance in the past.  It is
quite different from the sorts of injuries alleged by plaintiffs in
voting rights cases where we have found standing.

Lance, 549 U.S. at 442.  Plaintiffs' is the type of generalized and speculative

grievance that is insufficient to confer standing.  See, e.g., Carson v. Simon, Civil

File No. 20-2030 (NEB/TNL), 2020 WL 6018957, at *7 (D. Minn. Oct. 12, 2020)

(gathering cases).

### 4.    Redressability

The Court further notes that the defendant in this matter is the City of

Minneapolis, and the City alone.  CTCL is not a named defendant.  Plaintiffs do

not seek – and the Court does not have the power to grant – any injunctive relief

against CTCL.  Plaintiffs' accusations that CTCL is targeting grants to other

jurisdictions based on their political leanings in an attempt to influence the result

of the presidential election is irrelevant to the claims in this case, which are

brought only by Minneapolis voters and the organization to which they belong

against the City of Minneapolis.  The only pertinent questions are whether the

City has caused or will cause injury to Plaintiffs and whether Plaintiffs'

grievances can be redressed by this Court's injunction against the City.  The

answer to those questions is a clear "no."

### 5.      Minnesota Voters Alliance's Standing

An organizational plaintiff, such as Minnesota Voters Alliance, must

demonstrate either that it has standing "in its own right" because the

organization itself has suffered a legally sufficient harm, or "as the representative

of its members."  Warth v. Seldin, 422 U.S. 490, 511, 515 (1975).  To have standing

in its own right, an organization must have suffered its own injury-in-fact that

gives it "a personal stake in the outcome of the controversy," which is caused by

the City's conduct and is redressable by a favorable litigation outcome.  Havens

Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982).  The organization's claimed

injury must be "more than simply a setback to the organization's abstract societal

interests."  Id. at 379.  In order to show that it has standing to sue on behalf of its

members, an organization's members must otherwise have standing to sue in

their own right.  <u>Hunt v. Wash. State Apple Advertising Comm'n</u>, 432 U.S. 333, 343 (1977).

Minnesota Voters Alliance identifies no concrete injury that is distinct from the injury it ascribes to its membership.  "[G]eneral complaints about electoral outcomes are nonjusticiable."  <u>Pavek v. Donald J. Trump for President, Inc.</u>, 967 F.3d 905, 907 n.2 (8th Cir. 2020) (citing <u>Gill v. Whitford</u>, 138 S. Ct. 1916, 1931 (2018)).  Minnesota Voters Alliance fails to establish standing in its own right.  It cannot establish representational standing because its members, individual Plaintiffs, cannot establish standing.  Thus, Minnesota Voters Alliance lacks standing.

Because no Plaintiff can show standing, Plaintiffs' motion is denied, and the Court does not reach the merits, or lack thereof, of Plaintiffs' claims.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

Plaintiffs' Motion for Temporary Restraining Order [Docket No. 7] is **DENIED**.

Dated:   October 16, 2020                    s/ Michael J. Davis
                                             Michael J. Davis
                                             United States District Court

25