## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Minnesota Voters Alliance, Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson, | Civil No. 0:20-cv-02049-MJD-TNL |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |
| City of Minneapolis, | |
| Defendant. | |

In the waning days of the 2020 general election, and as a global pandemic intensified in Minnesota and elsewhere around the nation, the City of Minneapolis ("Defendant" or the "City") applied for, accepted, and spent a $2.3 million grant from a civic-engagement nonprofit organization to ensure a safe, secure, and efficient election for City voters. This Court has already ruled once that Plaintiffs—individuals Ronald Moey, Marissa Skaja, Charles R. Halverson, and Blair L. Johnson (the "Individual Plaintiffs") and the Minnesota Voters Alliance ("MVA," and with the Individual Plaintiffs, "Plaintiffs")—lack standing to challenge the City's acceptance of that grant because most of the statutory and constitutional authorities under which they originally sued did not provide a private right of action, and because they could not show the injury, causation, or redressability necessary for Article III standing.

Now that Election Day is over and the funds have been spent, Plaintiffs have tried to revive their case by challenging the City's use of the grant under a different set of constitutional provisions. But these new claims also fail for lack of standing; in addition,

they are moot in some respects, not yet ripe in others, and in all respects, fail on their merits. Accordingly, the City moves to dismiss the Amended Complaint in its entirety, and with prejudice, under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## I.    FACTUAL BACKGROUND[1]

The Center for Tech and Civic Life ("CTCL")—the entity making the grant Plaintiffs challenge—is a private non-profit organization providing federal election grants to local governments.   Am. Compl. ¶ 12 [ECF No. 29].   In 2020, CTCL received approximately $350 million in private donations that it in turn distributed to local governments to fund election administration during a pandemic.  Am. Compl. ¶ 13.  For the 2020 general election, multiple jurisdictions in Minnesota received election-related grants from CTCL.  Am. Compl. ¶ 14.

The City designed an effective, comprehensive plan—appropriately titled the "Safe Voting Plan"—to ensure that, even during a global pandemic, all Minneapolis voters could vote safely, securely, and efficiently in the highly consequential 2020 general election, and it applied to CTCL for $2,297,342 in grant funds (not $3 million, as Plaintiffs repeatedly allege) to cover the cost of implementing that plan.   Affidavit of Kristen G. Marttila

---

[1]  Although for purposes of this motion only, the City accepts the well-pleaded facts in Plaintiffs' Amended Complaint as true and draws all reasonable inferences in their favor, it also relies upon certain public records and materials embraced by the Amended Complaint—in particular, the City's legislative actions approving the application for and acceptance of the grant funds, as well as the Grant Agreement itself.   The Court may properly consider those official actions, as well as the resulting Grant Agreement between CTCL and the City, without converting this motion to dismiss into one for summary judgment.  *See Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015); *see also Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss.").

("Marttila Aff."), filed herewith, at Exs. A, B.  CTCL awarded the City the full amount it requested.  *Id*.  The City Council voted, and the Mayor agreed, to accept the grant funds. Marttila Ex. C.

As the Safe Voting Plan describes, CTCL's grant was allocated to fund numerous initiatives to ensure that Minneapolis voters could safely cast their ballots, even under existing pandemic conditions, using whatever method of voting they preferred:

| | |
|---|---|
| **Absentee Ballot Assembly and Processing Equipment**<br>• *Additional staff;*<br>• *High-speed letter openers;*<br>• *Facility expansion to accommodate social distancing;*<br>• *Vehicle rental for daily transport of materials;*<br>• *Mailing and printing supplies* | $2,082,312[2] |
| **Early Voting Sites and Ballot Drop-Off Options**<br>• *Additional staff for primary*<br>• *Signage*<br>• *Plexiglass barriers*<br>• *Printing*<br>• *Outdoor supplies* | $48,900[3] |
| **In-Person Voting at Polling Places on Election Day**<br>• *Materials like tape to mark social distancing, electrical cords, and door stops*<br>• *Printing for COVID-specific signage* | $3,295 |

---

[2]  Of this total amount, $1,816,203 is for expenses related to the general election, and $266,109 reimburses expenses from the August primary.  *See* Marttila Ex. A at A-10.

[3]  Of this total amount, $17,500 is for expenses relating to the general election, and $31,400 reimburses expenses from the August primary.  *See* Marttila Ex. A at A-11.

| | |
|---|---|
| **Secure Drop Boxes and Related Needs**<br>• *Ballot boxes, transfer containers*<br>• *Outdoor supplies*<br>• *Signage*<br>• *Printing*<br>• *Staff*<br>• *Vehicle*<br>• *Pallet jack* | $82,525 |
| **Voter Outreach and Education (VOE)** | $50,000 |
| **PPE**<br>• *Masks and face shields for staff and voters*<br>• *Sanitizer*<br>• *Disposable gloves* | $30,310 |
| **Total** | **$2,297,342**[4] |

*See* Marttila Ex. A at A-8 to A-13.

Before transmitting the grant funds to the City, CTCL and the City entered into a Grant Agreement setting forth the terms of the grant. The Grant Agreement memorialized the purpose for which the grant was intended, stating that "[t]he grant funds must be used exclusively for the public purpose of planning and operationalizing safe and secure election administration in the City of Minneapolis in 2020 ('Purpose')." *Id*. at A-1. It provided that the grant "must be used *only* for th[at] Purpose . . . and for no other purposes." *Id*. at A-2 ¶ 2 (emphasis in original). It further provided: "Due to special circumstances Grantee faces administering elections in 2020, Grantee has produced a plan for safe and secure election administration in 2020, including an assessment of election administration needs

---

[4]  Of this total amount, $1,833,703 is for expenses relating to the general election, and $297,509 reimburses expenses from the August primary. *See* Marttila Ex. A at A-10 to A-13.

and budget estimates for such assessment ('Safe Voting Plan'). . . . Grantee shall expend the total amount of grant funds listed in the Safe Voting Plan as detailed in the Safe Voting Plan, but may reallocate funds between budget items listed in the Safe Voting Plan with notice by electronic mail to CTCL. Such reallocation does not require the permission of CTCL." *Id*. ¶ 3. The City must spend all grant funds by December 31, 2020. *Id*. ¶¶ 5, 10. By January 31, 2020, the City must provide CTCL "a brief report explaining and documenting" that the grant-funded expenditures were made in a manner consistent with the Safe Voting Plan and must certify that it has complied with all terms of the Grant Agreement. *Id*. ¶ 7. The Grant Agreement also includes various administrative terms (*e.g.*, limiting the City's ability to make subgrants, confirming the legal authority to accept and expend the grant funds, and indemnifying the City with respect to this lawsuit). *See generally id*. at A-2. In addition, the Grant Agreement provides that "CTCL may discontinue, modify, withhold part of, or ask for the return [sic] all or part of the grant funds if it determines, in its sole judgment, that (a) any of the above terms and conditions of this grant have not been met, or (b) CTCL is required to do so to comply with applicable laws or regulations." *Id*. ¶ 9.

The City's administration of the 2020 general election proceeded without a hitch, in no small part because the grant provided the City sufficient funds to respond with speed and flexibility to the extraordinary circumstances of the moment. Hennepin County's canvassing board has now completed its canvass of the general election returns, declared the winners of offices within the County's jurisdiction, and transmitted its results to the State Canvassing Board. Minn. Stat. § 204C.33, subd. 1. The State Canvassing Board met

on November 24, 2020, and is required to declare the results of the state canvass no later than Friday, November 27, 2020.  Minn. Stat. § 204C.33, subd. 3.

## II.    PROCEDURAL BACKGROUND

On September 24, 2020, Plaintiffs—four Minneapolis residents and eligible voters in Minnesota's Fifth Congressional District, and one organization that purports to have members concerned with maintaining the integrity of Minnesota elections, *see* Compl. ¶¶ 4-8 [ECF No. 1], sued the City, alleging that the City's acceptance of the CTCL grant violated the Elections Clause and Supremacy Clause of the U.S. Constitution; the National Voter Registration Act, 52 U.S.C. §§ 20501-20511; the Help America Vote Act ("HAVA"), 52 USC §§ 20901-21145, Minnesota's criminal bribery statute, Minn. Stat. § 609.42, and Minnesota Session Laws, ch. 77 (May 12, 2020), which adopts state-based administrative-complaint procedures for reporting alleged HAVA violations.  *See generally id*.  Plaintiffs asked the Court to issue a temporary restraining order barring the City from using the grant funds.  ECF No. 7.  The thrust of the injury Plaintiffs claimed in their original complaint was that CTCL was a "progressive" organization that aimed to increase voter turnout in areas with more "progressive" voters, and that Plaintiffs were injured when their neighbors were able to safely cast votes with which Plaintiffs disagreed. *See* Compl. ¶¶ 38, 59; Order at 4, 18 [ECF No. 25].  On October 16, 2020, the Court correctly concluded that Plaintiffs lacked Article III standing to pursue any of the claims in their original complaint, and denied the motion for a temporary restraining order.  Order at 25.  The City used the grant funds to safely administer the November 3, 2020 general election.  Am. Compl. ¶ 14.

Ten days after the general election concluded, Plaintiffs filed an Amended Complaint, recasting their objections to the City's use of grant funds under new alleged authority.  The Amended Complaint alleges that the City's use of "conditional grants of private moneys" violates various constitutional provisions because "the local government pursuit of private conditional moneys to conduct federal elections undermines the integrity of the election process as a social contract to maintain their democratic form of government."  Am. Compl. at 1.  The Amended Complaint comprises two counts that contain nearly identical allegations.  *Compare* Am. Compl. Counts I & II.  To the extent they differ, Count I alleges that the City violated the Elections Clause, art. I, § 4, cl. 1, and the First and Ninth Amendments, because the allegedly "conditional" nature of the grant— in which CTCL may recoup unspent grant funds, or funds spent in a manner inconsistent with the Grant Agreement—"undermines the rights and obligations the voter is entitled to rely upon from the United States that implicates the integrity of the election."  Am. Compl. ¶ 93; *see also id.* ¶¶ 94-96.  Count II, by contrast, alleges that the City violated the Equal Protection Clause of the Fourteenth Amendment because the use of CTCL's election-administration grant may somehow result in a refusal to seat the Individual Plaintiffs' congressional representatives, thereby "disenfranchis[ing]" the Individual Plaintiffs compared with constituents of jurisdictions that did not accept CTCL grants and whose congressional representatives will be seated in the new Congress.  Am. Compl. ¶¶ 190-91. Plaintiffs do not challenge any other Minnesota jurisdiction's use of election-grant funds from CTCL, although they acknowledge that multiple jurisdictions accepted similar grants.

*See* Am. Compl. ¶ 14 ("CTCL has funded Minnesota local governments with conditional private grants that were and are used to conduct federal elections.").

## III.   ARGUMENT

The Amended Complaint should be dismissed in its entirety, and with prejudice, for multiple reasons.  Plaintiffs' claims are moot insofar as they seek declaratory relief as to the City's past conduct, and they are not ripe insofar as they seek to enjoin or otherwise avoid future conduct by the City.  As these are the only two forms of relief Plaintiffs seek, *see* Am. Compl. at Prayer for Relief ¶¶ 1-4, these mootness and ripeness deficiencies doom the entire action.  Furthermore, Plaintiffs point to no concrete and particularized injury caused by the City's use of the grant funds that could conceivably be redressed by this lawsuit, and they therefore lack Article III standing.  For all these reasons, the City now moves to dismiss Plaintiffs' Amended Complaint with prejudice under Rule 12(b)(1) for lack of subject-matter jurisdiction.  In addition, Plaintiffs have not plausibly pleaded claims for which relief can be granted, and both claims should be dismissed under Rule 12(b)(6).

### A.   <u>Standard of Review</u>

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept the Amended Complaint's "well-pleaded allegations . . . as true and draw all reasonable inferences in favor of the plaintiffs."  *Sanzone v. Mercy Health,* 954 F.3d 1031, 1040 (8th Cir. 2020) (citation omitted).  Courts also may look beyond the complaint to public records and "materials embraced by the complaint" without converting the motion into one for summary judgment.  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 983 (8th Cir. 2008).  That is true even if such documents refute the complaint itself.  *Zean v. Fairview*

*Health Servs.*, 858 F.3d 520, 527 (8th Cir. 2017).  A motion to dismiss must be granted unless the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In reviewing a facial challenge to subject-matter jurisdiction under Rule 12(b)(1), courts apply this same standard of review.  *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016).

### B.  This Court lacks subject-matter jurisdiction over Plaintiffs' claims.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (citation omitted).  "A case or controversy must be present at the beginning of a lawsuit and must continue throughout."  *Brazil v. Ark. Dep't of Human Servs.*, 892 F.3d 957, 959 (8th Cir. 2018).  The Eighth Circuit defines "case or controversy" to require "a definite and concrete controversy involving adverse legal interests at every stage in the litigation."  *McFarlin v. Newport Special Sch. Dist.*, 980 F.2d 1208, 1210 (8th Cir. 1992) (citation omitted).  "Federal courts must always satisfy themselves that this requirement has been met before reaching the merits of a case. Courts employ a number of doctrines to determine justiciability such as standing, ripeness, and mootness."  *Schanou v. Lancaster Cty. Sch. Dist. No. 160*, 62 F.3d 1040, 1042 (8th Cir. 1995).  Applying these doctrines here makes clear that this Court lacks jurisdiction over any aspect of Plaintiffs' claims.

1.   <u>Plaintiffs' claims are moot insofar as they seek a declaratory judgment
as to the City's past conduct.</u>

"When a case no longer presents an actual, ongoing case or controversy, the case is

moot and the federal court no longer has jurisdiction to hear it." *Hickman v. State of Mo.*,

144 F.3d 1141, 1142 (8th Cir. 1998) (quotation and alteration omitted).  This requirement

"applies with equal force to actions for declaratory judgment as it does to actions seeking

traditional coercive relief." *Id.* (quoting *Marine Equip. Mgmt Co. v. United States*, 4 F.3d

643, 646 (8th Cir. 1993)).  Because, absent present adverse effects, the "'[p]ast exposure

to illegal conduct is not enough'" to show standing (a related doctrine discussed in greater

depth below), "a claim for equitable relief . . . becomes moot when the plaintiff is no longer

subject to" the conduct they challenge.  *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th

Cir. 2006) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  The test to

determine whether there is an actual controversy within the meaning of the Declaratory

Judgment Act is whether "there is a substantial controversy between the parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment." *Marine Equip. Mgmt. Co.*, 4 F.3d at 646 (citation omitted).

Plaintiffs seek a declaratory judgment that the City's past acceptance of private

election-administration grants is unconstitutional under the Elections Clause, the First and

Ninth Amendment, and the Equal Protection Clause of the U.S. Constitution.  Am. Compl.

at Prayer for Relief ¶¶ 1-2.  These claims do not present an actual, live case or controversy.

The election is over, the votes have been counted and tabulated, and the funds have been

spent.  At this point, a declaratory judgment would not alleviate any alleged deficiencies

or infirmities in the election results, nor would the declaration Plaintiffs seek retroactively change the way in which the City carried out its financial and administrative responsibilities with respect to the election.  Accordingly, the Court lacks subject matter jurisdiction over the claims for declaratory relief and should dismiss them as moot.

2.     Plaintiffs' claims for injunctive relief are not ripe.

By the same token, Plaintiffs' requests for an injunction barring the City from applying for or accepting CTCL or other private grant funds in the future are not ripe.  *See* Am. Compl. ¶¶ 3-4.  "The ripeness inquiry requires examination of both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014) (citations omitted). "The fitness prong safeguards against judicial review of hypothetical or speculative disagreements" and "[t]he hardship prong asks whether delayed review inflicts significant practical harm on the plaintiffs."  *Id.* (citations and internal quotations omitted).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted).

Here, Plaintiffs' claims as they relate to potential future grants are neither fit for judicial decision nor will delaying consideration of these claims result in any hardship to Plaintiffs.  Plaintiffs' requests for injunctive relief are based on purely hypothetical future events that may never come to pass.  It is by no means certain that either CTCL or any other private entity will offer grants to cities to defray federal election-administration costs in the future, and it is equally uncertain as to whether the City of Minneapolis would apply

for, be awarded, or accept such funds in the future.  The criteria, conditions, and circumstances of any such grants are also unknown and unknowable at this time.  And the likelihood of this issue recurring seems particularly low due to the unique circumstances in which the City's application for the CTCL grant arose—having to administer a general election during an intensifying global pandemic unprecedented in the last century. Accordingly, because the Court does not have sufficient facts at this time upon which to base a decision regarding whether the hypothetical future acceptance of private grants from CTCL or any other entity would violate the Constitution, this issue is not fit for judicial adjudication at this time.

For similar reasons, denying review will not result in any harm to Plaintiffs.  There is nothing to indicate that the City will be offered or intends to seek private grants to help fund election administration in the future, and, again, given the unique circumstances under which this grant arose, it is more likely than not that this situation will not occur again at all.  *Cf. Parrish*, 761 F.3d at 876.  Because Plaintiffs' alleged injuries are directly tied to this particular Grant Agreement, the administration of this particular election, and the particular public-health circumstances of this historical moment, Plaintiffs will suffer no harm if their concerns are not adjudicated now, after this grant has been spent, this election concluded, and with no subsequent election underway or imminent.  For these reasons, the Court should dismiss Plaintiffs' claims for injunctive relief as not ripe.

        3.     <u>Plaintiffs Lack Standing.</u>

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a

'likelihood' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (citation omitted). The injury-in-fact requirement ensures that plaintiffs have a personal stake in the outcome of a controversy. *Id*. "[A]n injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An injury is "concrete" if it "actually exist[s]" in a way that is "'real' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-49 (2016) (as revised May 24, 2016). It is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 561 n.1). Future injury suffices only "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 157-58 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013)). A claim of future injury that is speculative or merely "possible" is "not sufficient." *Clapper*, 568 U.S. at 409.

Plaintiffs cannot satisfy the standing requirement under any of their theories of harm.

a)     *Plaintiffs cannot establish standing based on bare statutory violations.*

In concluding that Plaintiffs lacked standing to assert the claims in their original complaint, this Court has already correctly concluded that Plaintiffs "claim[ed] only harm to [their] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits [them] than it does the public at

large."  Order at 11-12 (quoting *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam)).

Although the Amended Complaint invokes new legal authorities that, according to

Plaintiffs, the City's use of the grant supposedly violated, the same conclusion is

unavoidable now: "Plaintiffs' bare claims that the City has violated various laws are

insufficient to satisfy the injury-in-fact requirement."  Order at 11.  Courts considering

similar standing arguments made in substantially identical cases that Plaintiffs' counsel

have filed around the country have reached the same conclusion.[5]

Once again, Plaintiffs have alleged merely that "the law . . . has not been followed"

in how the City has funded its pandemic-related election-administration expenditures,

thereby undermining the integrity of the election.  *Lance*, 549 U.S. at 442; *see generally*

Am. Compl. Counts I & II.  But that is "precisely the kind of undifferentiated, generalized

grievance about the conduct of government that [federal courts] have refused to

---

[5]  In addition to this case against the City, Plaintiffs' counsel have initiated substantially identical parallel litigation in seven other jurisdictions, and in all of them have been preliminarily denied the relief they sought.  *See Wis. Voters All. v. City of Racine*, No. 20-cv-1487-WCG (E.D. Wis. Sept. 24, 2020); *Pa. Voters All. v. Centre Cty.*, No. 4:20-cv-1761 (M.D. Pa. Sept. 25, 2020); *Election Integrity Fund v. City of Lansing*, No. 20-cv-950 (W.D. Mich. Sept. 29, 2020); *Iowa Voter All. v. Black Hawk Cty.*, No. 6:20-cv-2078-LTS (N.D. Iowa Oct. 1, 2020); *Ga. Voter All. v. Fulton Cty.*, No. 1:20-cv-4198-LMM (N.D. Ga. Oct. 9, 2020); *S.C. Voter's All. v. Charleston Cty.*, No. 2:20-3710-RMG (D.S.C. Oct. 22, 2020.  The courts in three of those parallel cases analyzed standing, and in each instance, concluded that those plaintiffs lacked standing to allege, as Plaintiffs in this case do, generalized grievances alleging that election-administration grants made by CTCL to various local jurisdictions did not comport with state or federal law.  *See generally Penn. Voters All. v. Centre Cty.*, No. 4:20-CV-01761, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020), *aff'd* No. 20-3175 (3d Cir. Nov. 23, 2020) [ECF No. 28] (summarily dismissing appeal for lack of standing); *Tex. Voters All. v. Dallas Cty.*, Civ. No. 4:20-CV-00775, 2020 WL 6146248, at *4 (E.D. Tex. Oct. 20, 2020); *Election Integrity Fund v. City of Lansing*, No. 1:20-cv-950 (W.D. Mich. Oct. 19, 2020).

countenance." *Lance*, 549 U.S. at 442; *see also id.* at 439-42 (collecting and examining cases). Federal courts "refus[e] to serve as a forum for generalized grievances" that do not reflect a personal stake in the resolution of the issues sought to be adjudicated. *Id.* at 439. Whatever Plaintiffs may "believe" about whether the City's use of the grant funds "interferes with the social contract," or about how it affects their own subjective ability to "accept[ ] . . . the election," *see, e.g.*, Am. Compl. ¶¶ 94-97, 179-83, a plaintiff's "[e]motional involvement i[n] a lawsuit is not enough to meet the case-or-controversy requirement." *Ashcroft v. Mattis*, 431 U.S. 171, 173 (1977).

As with Plaintiffs' original complaint, nowhere does the Amended Complaint allege any injury to any Individual Plaintiff's own right to vote. *See generally* Am. Compl.; Order at 21. To the contrary, "[t]he City's actions in applying for and accepting the CTCL grant and using the grant money to improve all manners of voting in Minneapolis in the 2020 election affect all Minneapolis voters equally" and "ma[d]e it easier for the individual Plaintiffs to vote safely for the candidates of their choosing." Order at 21-22; *accord Tex. Voters All. v. Dallas Cty.*, Civ. No. 4:20-CV-00775, 2020 WL 6146248, at *4 (E.D. Tex. Oct. 20, 2020) ("it is a mystery how the expansion of voting opportunities burdens anyone's right to vote." (internal quotation omitted)). Improved access to voting is not an injury.

> b) *Plaintiffs' "social contract" theory of standing cannot be reconciled with decades of binding precedent.*

Plaintiffs argue that a "social contract" is created by the Constitution with respect to the conduct and financing of elections, and that the City's use of the election-

administration grant "interferes with" that social contract, thus violating Plaintiffs' rights. *E.g.*, Am. Compl. ¶¶ 68-69, 84-85, 94-98. This theory of standing is indistinguishable from any other type of generalized grievance that the law has not been followed. *Lance*, 549 U.S. at 442. As the court in the parallel Pennsylvania case already recognized, accepting this theory of standing would require a "reject[ion] of the entirety of standing doctrine as it exists today. Under Plaintiffs' theory, any citizen of the United States would have standing to challenge any constitutional violation for any reason. This is simply not supported by precedent or doctrine." *Penn. Voters All.*, 2020 WL 6158309, at *5 (collecting cases), *aff'd* No. 20-3175 (3d Cir. Nov. 23, 2020) [ECF No. 28] (summarily dismissing appeal for lack of standing). For these same reasons, the Court should reject this theory of standing here.

<blockquote>

c)   *The hypothetical possibility that Congress might refuse to seat the Individual Plaintiffs' federal elected officials does not suffice to create standing.*

</blockquote>

Neither can Plaintiffs credibly claim to be injured by the hypothetical possibility that one or more members of Minnesota's congressional delegation might not be seated as an attenuated result of the City's acceptance of the grant. For multiple, independently sufficient reasons, this theory of standing fails.

As an initial matter, an individual's temporary loss of legislative representation until a special election can be held is not a constitutionally cognizable injury. Such temporary vacancies periodically occur in the normal course of governance for a wide variety of reasons, and when they do, they are handled according to well-established statutory and procedural mechanisms. Plaintiffs are not damaged when their representation in Congress

is determined according to law.  The court in the parallel Pennsylvania case considered and rejected this same theory of standing.  *Penn. Voters All.*, 2020 WL 6158309, at *5 (explaining that "the Court is not aware of any cases holding that the right to be politically represented is a legally cognizable interest under Article III" and declining to do so because any right to political representation would not be particularized to plaintiffs but rather shared by all members of the country).

Furthermore, this potential harm is foreclosed by longstanding Supreme Court precedent.[6]  In *Powell v. McCormack*, the Court held that the Houses of Congress lack "authority to exclude any person, duly elected by [her] constituents, who meets all the requirements for membership expressly prescribed in the Constitution."  395 U.S. 486, 522, 522 n.44 (1969).  Accordingly, "in judging the qualifications of its members, Congress is limited to the standing qualifications prescribed in the Constitution"—that is, the minimum requirements for age, citizenship, and residency.  *Id*.; *see also Nixon v. United States*, 506 U.S. 224, 237 (1993) ("The decision as to whether a Member satisfied these qualifications was placed with the House [of Congress], but the decision as to what these qualifications consisted of was not.").  Accordingly, Congress lacks the authority to exclude elected officials based on the election-administration concerns Plaintiffs raise in this litigation.

---

[6]  To the extent the Amended Complaint asserts that Congress has discretion to exclude members due to alleged improprieties in the underlying election administration, that assertion presents a legal conclusion the Court need not accept as correct.  *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (citing *Bell Atl. Corp.*, 550 U.S. at 555).

But even if Plaintiffs were correct, and Congress could, at its discretion, exclude an elected official based on that body's own determination that the member's election was tainted in some way, *see* Am. Compl. ¶¶ 66, 99-102, 150, 184-87, Plaintiffs have alleged no facts remotely suggesting that it is at all realistic that such a thing would happen,[7] much less that it is "certainly impending," or that there is a "substantial risk that the harm will occur," as *Clapper* requires.  568 U.S. at 409-10, 414 n.5; *cf. Tex. Voters All.,* 2020 WL 6146248, at *19 (holding, in parallel Texas case, that "Plaintiffs allege harm because if the grants are illegal, and if there is a close election, then the losing candidate could potentially contest the result of the election.  That assertion includes many 'what ifs.'  It is so speculative that Plaintiffs could only characterize this series of unfortunate events as 'possible.'"); *Pa. Voters All.*, 2020 WL 6158309, at *5 (concluding that potential invalidation of election results resulting from local jurisdictions' acceptance of CTCL grants involves "a highly attenuated causal chain of events" inadequate to demonstrate that the alleged injury is "certainly impending").  The sheer possibility that Plaintiffs might temporarily lose their congressional representation as a result of such an exclusion is too speculative and attenuated to constitute an injury in fact sufficient for Article III standing.

Such a harm also would not be "fairly traceable" to the City's acceptance of the election grants.  *Lujan*, 504 U.S. at 560 (quotation omitted).  Rather, it would be "th[e]

---

[7] By the time the Court likely hears this motion, the 117th Congress will have convened. *See* U.S. Const. Am. XXIX ("The Congress shall assemble at least once in every year, and such meeting shall begin at noon on the 3d day of January, unless they shall by law appoint a different day.").  Once all ten members of Minnesota's congressional delegation are sworn in and seated, the claims premised on this alleged harm will no longer present an actual case or controversy, and will be moot.

result [of] the independent action of some third party"—either the House of Representatives or the Senate—"not before the court." *Id.* (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Because the potential injury "is the result of actions by some third party, not the defendant, the plaintiff cannot satisfy the causation element of the standing inquiry." *E.L. by White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932, 936 (8th Cir. 2017) (quoting *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 935 (8th Cir. 2012)).

For a similar reason, the relief Plaintiffs request in their Amended Complaint would not redress any potential harm that the Individual Plaintiffs' elected officials might be excluded from Congress. Plaintiffs seek a declaratory judgment that the City acted unconstitutionally in accepting the grant, and an injunction preventing the City from accepting election-administration grants in the future. Am. Compl. at Prayer for Relief ¶¶ 1-4. Neither of those remedies would do anything to "cure" the supposed infirmity that Plaintiffs contend taints the election of the Individual Plaintiffs' congressional representatives, or ensure those elected officials *are* able to take their seats in the new Congress. Article III standing requires that it be "likely" that a favorable decision in the litigation would redress the injury complained of; here, Plaintiffs have not alleged even a speculative mechanism through which the relief they request would redress the potential harm they allege. *Lujan*, 504 U.S. at 560-61.

d)    *MVA lacks standing.*

MVA, as an organizational plaintiff, must demonstrate either that it has standing "in its own right" because the organization itself has suffered a legally sufficient harm, or "as

the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511, 515 (1975). To have standing in its own right, MVA must have suffered its own injury-in-fact that gives it "a personal stake in the outcome of the controversy," which is caused by the City's conduct and is redressable by a favorable litigation outcome. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (citation omitted). MVA's claimed injury must be "more than simply a setback to the organization's abstract societal interests." *Id*. at 379.

Because MVA once again has identified no injury it has suffered that is distinct from the injury it ascribes to its membership, it cannot sue in its own right; it must instead show that it has standing to sue on behalf of its members, like the individual Plaintiffs. *See* Order at 25. This type of standing requires, among other things, that MVA's members would otherwise have standing to sue in their own right. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). For the reasons described above, the Individual Plaintiffs lack standing on any of their claims, and MVA therefore lacks standing to sue on their behalf.

**C.    Both of Plaintiffs' claims fail on their merits.**

In addition to the fatal jurisdictional problems described above, both of Plaintiffs' claims fail on their merits, and should be dismissed under Rule 12(b)(6).

   1.    The legal theory underlying Count I is not supported by either the Elections Clause, the First Amendment, or the Ninth Amendment.

In Count I, Plaintiffs allege a novel, if barely discernable, constitutional theory: that because, under the Grant Agreement, "CTCL may discontinue, modify, withhold part of, or ask for a return [of] all or part of the grant funds if it determines, in its sole judgment,

that" the City did not fulfill its obligations under the grant—for example, to spend the funds during the permitted time period, or to spend them only on initiatives described in the City's Safe Voting Plan—this term somehow transformed CTCL from an entity making a grant into an entity "overseeing the conduct of federal elections in contradiction of the Elections Clause and the rights preserved to the people under the Ninth Amendment," and in violation of Plaintiffs' First Amendment rights to vote.  Marttila Ex. A at A-2 to A-3; Am. Compl. ¶¶ 23, 81, 83-84.  No support exists for this legal theory.

In no way does the Elections Clause conflict with the City's acceptance of the grant. The Elections Clause empowers states to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," and allows Congress "at any time by law [to] make or alter such Regulations." U.S. Const., art. I, § 4, cl.1.  "The Elections Clause has two functions.  Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) (citations omitted). Consequently, "[i]n practice, the Clause functions as a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices."  *Id*. (internal quotation marks omitted).

Plaintiffs do not seem to contest that the City's acceptance of grant funds does nothing to regulate the times or places of holding elections.  Neither does it affect the "manner" of holding elections: the Supreme Court has taken the "commonsense view [that]

that term encompasses matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns.'"   *Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Minn. Voters All. v. Walz,* No. 20-CV-1688 (PJS/ECW), 2020 WL 5869425, at *10 (D. Minn. Oct. 2, 2020) (relying on *Cook* to reject preliminary injunction sought in Elections Clause challenge to governor's executive order requiring masks be worn indoors, including at polling places).  Those subjects are all addressed by Minnesota law.  *See, e.g.*, Minn. Stat. chs. 201 (voter eligibility and registration), 203 (absentee voting), 204B (conduct of elections), 204C (Election Day activities), 206 (electronic voting systems); Minn. Stat. §§ 609B.139-144 (election-related crimes).  By contrast, the way in which states and their political subdivisions fund elections is a very different matter from the mechanistic processes the Supreme Court described in *Cook* as examples of state regulations as to the "manner" of elections, and arguably the funding of election administration is not within the meaning of the Elections Clause at all.  Moreover, Plaintiffs have identified no state law limiting permissible funding sources for local elections.  Indeed, the grant ensured the City that it had the funding needed to administer the election in the "manner" directed by state law, even under unprecedented pandemic conditions.

The only specific aspects of the Grant Agreement, or the Safe Voting Plan it incorporates by reference, which Plaintiffs seem to take issue with are: (1) a provision requiring the City to "produce a brief report explaining and documenting how grant funds have been expended in support of the activities described" in the Safe Voting Plan, *see*

Marttila Ex. A at A-2; and (2) provision allowing CTCL to pursue recoupment if "(a) any of the . . . terms and conditions of [the Grant Agreement] have not been met, or (b) CTCL is required to do so to comply with applicable laws or regulations." *Id*. at A-2 to A-3. This provision plainly does not allow CTCL to "oversee[ ] the conduct of federal elections," or "interfere[ ] with the social contract" as it regards election integrity. Am. Compl. ¶¶ 83-84. It does not permit CTCL to direct the City how to conduct the election or tabulate or report the votes cast. The Safe Voting Plan was designed by the City itself, this Court has already reviewed and approved its content, and Plaintiffs' Amended Complaint does not identify any of its expenditures as being legally problematic. After releasing the funds to the City, CTCL had no ongoing control of how those funds were spent. The Grant Agreement provides that the City may reallocate the grant funds among individual budget lines described in its Safe Voting Plan as it sees fit, and that such reallocation does not require CTCL's permission, only a courtesy notice by email. Marttila Ex. A at A-2. The City's retention of the grant funds is not contingent on obtaining any particular election outcomes, voter-turnout demographic data, voter-participation benchmarks, or any similar remotely result-oriented metric. It requires only that the City use the funds in the socially beneficial and legally permissible ways it itself designed, and the City's forthcoming report about its use of the grant will document that it did precisely that. The inclusion of reporting and recoupment provisions does not transmogrify the salutary measures of the City's Safe Voting Plan into a novel form of constitutional violation.

Neither does anything about the grant abridge Plaintiffs' First Amendment rights. It did not infringe upon Plaintiffs' speech or associational rights. To the extent it touched

upon Plaintiffs' voting rights at all, it enhanced them, by "mak[ing] it easier for the individual Plaintiffs to vote safely for the candidates of their choosing and to have those ballots processed promptly." Order at 21-22. This does not violate the First Amendment.

Finally, the Ninth Amendment does not save Count I, for the simple reason that the Ninth Amendment 'has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim." *Carter v. Rysh*, No. 17-cv-1061 (DWF/HB), 2018 WL 3802082, *3 (D. Minn. July 18, 2018) (quoting *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986)), *R&R adopted*, 2018 WL 3785169 (D. Minn. Aug. 9, 2018); *accord Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1011 (D. Minn. 2008), *rev'd in part on other grounds sub nom Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010).

In short, because Plaintiffs cannot establish a plausible claim that the Grant Agreement violates the Elections Clause, the First Amendment, or the Ninth Amendment, the Court should dismiss Count I.

### 2. Plaintiffs have not pleaded facts satisfying any element of an equal-protection violation in Count II.

In Count II, Plaintiffs fail to allege anything approaching a viable equal protection claim. "'The Equal Protection Clause requires that the government treat all similarly situated people alike.'" *Mensie v. City of Little Rock*, 917 F.3d 685, 691 (8th Cir. 2019) (quoting *Barstad v. Murray Cty.*, 420 F.3d 880, 884 (8th Cir. 2005)). Therefore, the Individual Plaintiffs must show that the City treated them differently than it did others who were similarly situated. *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124,

1129 (8th Cir. 2016).  Furthermore, because Plaintiffs do not allege that they are members

of a protected class, and because the City's conduct "impose[d] no burden" on the

Individual Plaintiffs' right to vote,[8] they must show that no rational basis exists for the

difference in treatment they allege.  *Higgins*, 813 F.3d at 1129; *Donald J. Trump for*

*President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at **39-40 (W.D. Pa.

Oct. 10, 2020) (describing the "sliding scale" that tailors the standard of review to the

"character and magnitude of the burden the State's rule imposes" on the right to vote, and

holding that "where the state imposes no burden on the 'right to vote' at all, true rational

basis review applies" (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358

(1997); *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019); *Biener v.*

*Calio*, 361 F.3d 206, 215 (3d Cir. 2004)).

The Amended Complaint alleges that, because there is a hypothetical future

possibility that the City's past use of grant funds to administer the election might result in

Congress refusing to seat one or more of the Individual Plaintiffs' elected federal

representatives, while seating elected officials representing other, unidentified jurisdictions

that did not use grant funds to administer the 2020 election, and that this hypothetical future

---

[8]  Indeed, the City's use of the grant funds to ensure safe access to a range of voting options
during a pandemic "*lifted* a burden on the right to vote, even if only for those who live in
[Minneapolis].  Expanding the right to vote for some residents of a state does not burden
the rights of others.  And Plaintiffs claim cannot stand to the extent that it complains that
the [City] is *not* imposing a restriction on *someone else's* right to vote."  *Donald J. Trump*
*for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 6821992, at *12 (W.D. Pa.
Nov. 21, 2020) (internal citations and quotation marks omitted, emphasis in original).

situation would deprive Plaintiffs of equal protection of the laws.  This theory gets every significant part of an equal-protection claim wrong.

First, Plaintiffs do not allege any way in which *the City*—the only defendant here—treated Plaintiffs differently from any other voters.  *Higgins*, 813 F.3d at 1129; *see also Am. Fam. Ins. Co. v. City of Minneapolis*, 836 F.3d 918, 921 (8th Cir. 2016).  As the Court has already noted, "[t]he City's actions in applying for and accepting the grant and using the grant money to improve all manners of voting in Minneapolis in the 2020 election affect all Minneapolis voters equally."  Order at 2.  At most, Plaintiffs have alleged that the City made different, universally applicable, election-administration choices than other, unidentified jurisdictions did.  But the City cannot be liable under an equal-protection theory simply because it treated all of its voters the same, and in doing so made different choices than did other jurisdictions who have not been named in this litigation.

Moreover, Plaintiffs do not identify any "similarly situated" individuals in any other jurisdiction who have been (or in the future might be) treated more favorably.  Plaintiffs allege in vague terms that "[o]ther local governmental entities in Minnesota did not use private moneys to conduct federal elections," Am. Compl. ¶ 170, and that if Congress refuses to seat Minneapolis' duly elected representatives, Minneapolis voters will be "disadvantaged . . . over [voters in] those local governmental entities who did not" accept grant funds, *id*. ¶ 187—basically, that by using grant funds, the City created a risk to its residents that residents of other jurisdictions do not face.  But Plaintiffs do not identify any other comparator district that is allegedly impervious to the risk that their federal elected officials might be excluded from Congress.  For example, they have not identified (and,

consistent with their Rule 11 obligations, cannot identify) even one of Minnesota's eight congressional districts that is comprised entirely of jurisdictions that took no grant money from CTCL.  They have alleged no facts from which the Court could reasonably infer that Plaintiffs—or Minneapolis voters, or residents of Minnesota's Fifth Congressional District—face a risk of lost representation that disadvantages them relative to other Minnesotans who do not face that risk.  *Cf.* Order at 5-6 (noting that "[m]ore than 1,100 jurisdictions have applied [for CTCL grants] so far, in almost every state," and that "[i]n Minnesota, CTCL has awarded grants to a variety of local election offices, including Albertville, Becker, Watertown, and 19 other jurisdictions").

Finally, even leaving aside the failure to allege any disparate treatment by the City, or to identify any similarly situated individuals or groups that allegedly were (or in the future may be) treated more favorably, the City used the grant funds to safely conduct a high-turnout, highly consequential election in a densely populated city during a global pandemic that is currently ravaging the upper Midwest.  It would be a considerable understatement to characterize this as a "rational basis" for the City's decision to accept a pandemic-specific election-administration grant.

Because Plaintiffs have failed to plausibly allege different treatment by the City, any particular comparator jurisdiction treated more favorably, or that the City lacked a legally sufficient rationale for the City's action, their equal-protection claim should be dismissed.

## IV.   CONCLUSION

The Court has already ruled once that Plaintiffs lack Article III standing to challenge the City's acceptance of a grant to safely administer the 2020 general election.   Their Amended Complaint does not remedy that defect.   In fact, it suffers from additional jurisdictional defects—mootness and lack of ripeness—that further elucidate why this case does not present a "case or controversy."   The Court therefore should dismiss the Amended Complaint for lack of jurisdiction under Rule 12(b)(1).   But even if Plaintiffs could somehow clear the jurisdictional bar, they have failed to plausibly plead a viable cause of action in either of their counts, and dismissal is also required under Rule 12(b)(6).   Having now failed twice to plead a viable claim over which the Court has jurisdiction, the Amended Complaint should be dismissed with prejudice.

Dated:  November 25, 2020               LOCKRIDGE GRINDAL NAUEN P.L.L.P.

                                        s/Charles N. Nauen
                                        Charles N. Nauen (#121216)
                                        David J. Zoll (#0330681)
                                        Kristen G. Marttila (#346007)
                                        100 Washington Avenue South, Suite 2200
                                        Minneapolis, MN 55401
                                        (612) 339-6900
                                        cnnauen@locklaw.com
                                        djzoll@locklaw.com
                                        kgmarttila@locklaw.com

                                        Gregory P. Sautter (#0326446)
                                        Assistant City Attorney
                                        City of Minneapolis
                                        City Hall, Room 210
                                        350 South Fifth Street
                                        Minneapolis, MN 55415
                                        (612) 673-2683
                                        gregory.sautter@minneapolismn.gov

                                        *Attorneys for Defendant*